# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

===========================

## ON MOTION FOR REHEARING

===========================

### NO. 03-04-00718-CR

**Raymond Garcia, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 390TH JUDICIAL DISTRICT
### NO. 9044143, HONORABLE JON N. WISSER, JUDGE PRESIDING

### O P I N I O N

We overrule appellant's motion for rehearing, withdraw our opinion and judgment issued September 29, 2006, and substitute the following in its place.

The jury found appellant Raymond Garcia guilty of the offenses of aggravated assault with a deadly weapon, felony assault—family violence, violation of a protective order, and endangering a child. *See* Tex. Pen. Code Ann. §§ 22.01(a)(1), (b)(2) (felony assault—family violence), 22.02(a)(2) (aggravated assault with a deadly weapon), 22.041 (endangering a child), 25.07 (violation of protective order) (West Supp. 2006). In six issues on appeal, Garcia asserts a Confrontation Clause violation, claims multiple errors in the jury charge, and challenges the constitutionality of section 25.07 of the penal code. We will affirm.

# BACKGROUND

The jury heard evidence that on the afternoon of July 17, 2003, Officer William Norell of the Austin Police Department was dispatched to an apartment where a "family disturbance with an assault" had been reported. Norell testified that, upon arrival, he encountered Jessica Garcia and her "probably six or seven year old" daughter sitting on the steps of the stairway outside the apartment. Norell explained that Jessica's eyes were swollen and he could tell that she was upset and had been crying. Over a hearsay and Confrontation Clause objection by defense counsel, Norell testified to what Jessica told him about what had happened:

> She told me that she had been at her parents' house the night before, spent the night with them for some reason, and when she came home, Mr. Garcia was in her apartment.
>
> She told me that Mr. Garcia was not supposed to be in the house due to a protective order that was issued. And that Mr. Garcia wanted her and the children to go with him to his parents' house on Blackson Street. And she told him that she was not going and the children were not going, and that he was not even supposed to be there because of the protective order.
>
> She said that when she told him that she wasn't going and the children weren't going, that he became upset and started to get violent with her.
>
> He—I believe he—at first, he grabbed the fireplace poker and started threatening her with it. And then she said she feared bodily injury, that he was going to hurt her with the poker and take the child, the younger child. And she said that after the argument, after the threatening with the poker, he eventually ended up punching her in the left eye, in the left forehead and then in her left arm.

Norell also explained that Jessica told him that "there was a struggle" over their two-year-old son and that Garcia "grabbed the child by the arms and pulled extremely hard while she [Jessica] was pulling to maintain control of the child." Jessica told Norell that Garcia "left out the door" with the

2

child and "boarded a bus that had just arrived." Jessica told Norell that Garcia told her that "he was going to his parents' house." Norell broadcast Garcia's description over the police radio so that other officers could try to locate him.

Officer Ricardo Reza of the Austin Police Department testified that he encountered Garcia "walking in a field" and "carrying a two-year-old kid." Reza explained that, once Garcia noticed him, Garcia began running away, still carrying the child. Reza ran after him. During the foot chase, Reza met up with Corporal Andrew Haynes, who joined Reza in the pursuit of Garcia. Garcia eventually ran through the parking lot of a gas station where, according to Reza, Garcia "takes his kid from his arm, places him on the trunk of a vehicle, and without stopping or slowing down, places his son on the trunk, and then he really takes off sprinting eastbound towards St. Johns." Reza testified that Haynes remained with the child while Reza continued the pursuit. Garcia was finally apprehended outside the American Inn along the IH-35 frontage road.

Garcia was charged with one count of aggravated assault, one count of assault—family violence, one count of violating a protective order, and one count of endangering a child. The count charging Garcia with endangering a child contained two paragraphs alleging that Garcia committed the offense either by "striking Jessica Garcia with his hand while the said Jessica Garcia was holding" the child or by "pulling the child with his hand."

The jury found Garcia guilty of all four counts in the indictment. The district court assessed punishment at 20 years' confinement for the offense of endangering a child and 25 years' confinement for the offenses of aggravated assault, felony assault—family violence, and violation of a protective order, with the sentences running concurrently. This appeal followed.

3

**DISCUSSION**

**Confrontation Clause violation**

In his first issue, Garcia asserts that his constitutional right to confront and cross-examine witnesses was violated when the district court allowed Officer Norell to testify to out-of-court statements made by Jessica. *See* U.S. Const. amend. VI.

Before Officer Norell testified to Jessica's out-of court statements describing what happened on the night in question, Garcia objected to the admission of the statements on the basis of hearsay and "the violation of the defendant's right to cross-examine . . . and confront the witnesses against him." The district court then asked the State about the applicability of *Crawford v. Washington*, 541 U.S. 36 (2004).[1] Citing to this Court's opinion in *Cassidy v. State*, 149 S.W.3d 712 (Tex. App.—Austin 2004, pet. ref'd), *cert. denied*, 544 U.S. 925 (2005), the State responded that *Crawford* did not apply to "excited utterances"[2] and, "even if *Crawford* applies, his [Garcia's] Sixth Amendment right will be satisfied, because Ms. Garcia is present and available to be cross-examined and she will be offered as a witness in this case." Concluding that Jessica's availability "took care of the *Crawford* question," the district court overruled Garcia's objection. However, although Jessica was subpoenaed to testify and appeared in court on the first three days of the trial, she did not appear in court on the day she was scheduled to testify and, in fact, never testified.

---

[1] Garcia was tried in September 2004, less than seven months after *Crawford* was decided.

[2] After this Court decided *Cassidy*, the court of criminal appeals held that "a testimonial statement is inadmissible absent a showing that the declarant is presently unavailable and the defendant had a prior opportunity for cross-examination, *even if the statement falls under a firmly rooted hearsay exception* or bears particularized guarantees of trustworthiness." *Wall v. State*, 184 S.W.3d 730, 734-35 (Tex. Crim. App. 2006) (emphasis added).

4

We review alleged violations of the Confrontation Clause *de novo*. *See Wall v. State*, 184 S.W.3d 730, 742-43 (Tex. Crim. App. 2006); *see also Lilly v. Virginia*, 527 U.S. 116, 137 (1999) (stating that courts should "independently review" whether out-of-court statements violate Confrontation Clause). We must affirm a trial court's ruling if it is correct under any theory of law applicable to the case and supported by the record even if the trial court gives the wrong reason for its ruling. *Estrada v. State*, 154 S.W.3d 604, 607 (Tex. Crim. App. 2005).

In *Crawford*, the Supreme Court interpreted the Confrontation Clause to prohibit a witness from recounting a declarant's out-of-court statements that are testimonial unless (1) the declarant is unavailable to testify and (2) the defendant had a prior opportunity to cross-examine the declarant, regardless of whether the declarant's statements are deemed reliable by the court. *See Crawford*, 541 U.S. at 68.

The Supreme Court recently explained the distinction between testimonial and non-testimonial statements:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

*Davis v. Washington*, 126 S. Ct. 2266, 2273-74 (2006).

In *Davis*, the Supreme Court addressed whether statements made by a victim of domestic violence to a 911 operator were testimonial in nature. *Id*. at 2276-77. In concluding that the caller's statements were not testimonial and thus admissible, the Court looked to the following factors: (1) the caller was describing events as they were actually happening rather than past events;

5

(2) any reasonable listener would recognize that the caller was facing an ongoing emergency; (3) the nature of what was asked and answered, when viewed objectively, was such that the elicited statements were necessary to be able to resolve the present emergency, rather than simply to learn what had happened in the past; and (4) the caller was frantically answering the 911 emergency operator's questions over the phone, in an environment that was not tranquil, or even safe. *Id*. The Court stated that the caller was "seeking aid, not telling a story about the past." *Id*. at 2279.

The Court also observed that "initial inquiries" by law enforcement officers arriving at crime scenes involving "domestic disputes" "may often" produce nontestimonial statements because "officers called to investigate . . . need to know whom they are dealing with in order to assess the situation, the threat to their own safety, and possible danger to the potential victim." *Id*. Such statements may be nontestimonial if they constitute "a cry for help" or "the provision of information enabling officers to end a threatening situation." *See id*. That is the situation here.[3]

In this case, Officer Norell testified that he arrived at the apartment approximately "five to ten minutes" after Jessica had called 911 to report that Garcia had taken the child. Upon his arrival, Jessica made several statements concerning an ongoing emergency—the kidnaping of her child—and the nature and extent of any threat Garcia presented to the child or law enforcement

---

[3] In a "Supplemental Authority to Appellant's Brief," Garcia cites this Court's opinion in *Davis v. State*, 169 S.W.3d 660 (Tex. App.—Austin 2005, pet. granted), for the proposition that statements are testimonial if they are made to "a police officer carrying out an investigation." *See id*. at 667. However, we decided *Davis* prior to the Supreme Court's decision in *Davis v. Washington*, in which the Supreme Court explained that questioning by police officers carrying out investigations may or may not "yield nontestimonial answers" depending on the "exigencies" surrounding each particular investigation. 126 S. Ct. 2266, 2279 (2006). We also note that this Court held in *Davis* that "[e]ach case must be examined on its facts to determine if the evidence is testimonial." 169 S.W.3d at 671.

attempting to recover the child. Jessica told him that Garcia had forcibly taken their two-year-old son away from her arms and left with the child on a bus. Jessica explained to Norell that she "feared that he [the child] might be injured because of the force that was used when Mr. Garcia pulled him from her arms." Jessica further explained that Garcia had threatened her with a fireplace poker and punched her in her eye, forehead, and left arm. These statements enabled law enforcement to ascertain that Garcia had kidnaped the child, where Garcia had taken the child, that the child may have been injured, that Garcia had undertaken these acts violently, and the degree of violent threat he presented to the child, law enforcement, or others.

Garcia contends, however, that even if some of Jessica's statements enabled the officers to end a threatening situation, others did not, and those statements should have been excluded. Specifically, Garcia argues that Jessica's statement that Garcia "grabbed the fireplace poker and started threatening her with it" and her statement that Garcia "eventually ended up punching her in the left eye, in the left forehead and then in her left arm" did not assist the officers in resolving the ongoing emergency.[4] We disagree. Not only the fact that Garcia was acting violently during this kidnaping episode, but the nature and extent of his violence—including conduct rising to the level of a second degree felony, the same classification as if Garcia had threatened Jessica with a gun—enabled law enforcement "to know whom they are dealing with in order to assess the situation, the threat to their own safety, and possible danger to the potential victim."

_____

[4] Officer Norell did testify to a statement by Jessica that Garcia had violated a protective order when entering her apartment. Even if the district court abused its discretion in admitting this statement, its admission was harmless because the protective order itself was later introduced and the fact of his presence in Jessica's apartment was established through the nontestimonial statements discussed above.

7

*Davis v. Washington*, 126 S. Ct. at 2279. These circumstances "objectively indicat[e] that the primary purpose of the interrogation [was] to enable police assistance to meet an ongoing emergency." *Id.* at 2273-74. The statements were thus nontestimonial in nature, and their admission did not violate the Confrontation Clause.[5]

We overrule Garcia's first issue.

**Deadly weapon instruction**

In his second issue, Garcia contends that the district court's instructions to the jury regarding a deadly weapon definition constituted an impermissible comment on the weight of the evidence.

The jury charge defined "deadly weapon" as "anything manifestly designed, made, or adapted for the purpose of inflicting death or serious bodily injury; or anything that in the manner of its use or intended use is capable of causing death or serious bodily injury." This definition tracks the language provided in the penal code. *See* Tex. Pen. Code Ann. § 1.07(17) (West Supp. 2006). In the application paragraph alleging aggravated assault, however, only the second part of the definition was included:

> Now bearing in mind the foregoing instructions, if you believe from the evidence beyond a reasonable doubt that the defendant Raymond Garcia . . . did then and there: intentionally or knowingly threaten Jessica Garcia with imminent bodily injury, and did then and there use or exhibit a deadly weapon, to wit: a fireplace poker, *which in the manner of its use or intended use was capable of causing death or serious bodily injury*, during the commission of this offense; you will find the defendant guilty . . . .

---

[5] We note that our resolution of this issue is highly dependent upon the unique set of facts that were present in this case. As we have previously acknowledged, "[e]ach case must be examined on its facts to determine if the evidence is testimonial." *Davis*, 169 S.W.3d at 671.

(Emphasis added).

Garcia asserts that "[e]xplaining two ways an object can meet the definition of a deadly weapon in the first paragraph of the charge and including only one of those ways in the application paragraph can imply to the jury that the judge is thereby informing them that [the judge] has found the object in question to meet the legal definition of a deadly weapon."  The State responds that the charge "provided the jurors with the exact definition from the Texas Penal Code, then tailored the definition in the application to include only the law applicable to the case." We agree with the State.

The code of criminal procedure provides that the judge shall deliver to the jury "a written charge distinctly setting forth the law applicable to the case; not expressing any opinion as to the weight of the evidence, not summing up the testimony, discussing the facts or using any argument in his charge calculated to arouse the sympathy or excite the passions of the jury."  Tex. Code Crim. Proc. Ann. art. 36.14 (West Supp. 2006).

We can find no authority for Garcia's contention that including only the second part of the deadly weapon definition in the application paragraph constitutes a comment on the weight of the evidence.  We conclude that the district court permissibly tailored the definition to include only the law applicable to the case.  As Garcia concedes, a fireplace poker is not a deadly weapon *per se*.  It is not "manifestly designed, made, or adapted for the purpose of inflicting death or serious bodily injury."  Therefore, the first part of the deadly weapon definition does not apply to this case, and it was not error for the district court to exclude that part of the definition from the application paragraph.  We overrule Garcia's second issue.

9

**Jury unanimity**

In his third and fourth issues, Garcia asserts that he suffered egregious harm when "two separate offenses of endangering a child were submitted to the jury in the disjunctive," thus depriving him of his "right to a unanimous verdict."

The Texas Constitution requires a unanimous verdict in felony criminal cases. Tex. Const. art. V, § 13; Tex. Code Crim. Proc. Ann. art. 36.29(a) (West Supp. 2006). Allowing a jury to choose from several separate acts, each of which is a violation of a specific statute, without requiring the jury to agree on which act was committed violates the unanimity requirement. *Ngo v. State*, 175 S.W.3d 738, 747-48 (Tex. Crim. App. 2005); *Francis v. State*, 36 S.W.3d 121, 124-25 (Tex. Crim. App. 2000). However, allowing a jury to choose between alternative theories of how an offense was committed does not run afoul of the unanimous-verdict requirement. *Martinez v. State*, 129 S.W.3d 101, 103 (Tex. Crim. App. 2004); *Kitchens v. State*, 823 S.W.2d 256, 258 (Tex. Crim. App. 1991). If an indictment alleges differing means of committing an offense, a trial court does not err by charging the jury in the disjunctive. *Jones v. State*, 184 S.W.3d 915, 922 n.6 (Tex. App.—Austin 2006, no pet.).

Paragraph VIII of the jury charge contained the application paragraph for Count IV of the indictment, Endangering a Child:

> Now bearing in mind the foregoing instructions, if you believe from the evidence beyond a reasonable doubt that the defendant Raymond Garcia . . . did then and there:
>
> intentionally, knowingly, or recklessly, engage in conduct that placed Raymond Garcia, Jr., a child 14 years of age or younger, in imminent danger of death, bodily injury, or physical or mental impairment, by striking Jessica Garcia with his hand while the said Jessica Garcia was holding Raymond Garcia, Jr.; and / or

10

> intentionally, knowingly, or recklessly, engage in conduct that placed Raymond Garcia, Jr., a child 14 years of age or younger, in imminent danger of death, bodily injury, or physical or mental impairment, by pulling Raymond Garcia with his hand;
>
> you will find the defendant guilty of Endangering a Child . . . .

Paragraph XVII of the jury charge instructed the jury that its "verdicts must be unanimous."

Garcia asserts that Paragraph VIII contained two separate offenses, and that Garcia was deprived his right to a unanimous verdict because some of the jurors could have believed Garcia struck Jessica while she was holding the child while other jurors believed Garcia pulled the child. The State argues that the paragraph contained two different means of committing a single offense, and that the jurors need not agree on the manner in which Garcia committed the offense for the unanimity requirement to be satisfied.

A person commits the offense of endangering a child "if he intentionally, knowingly, recklessly, or with criminal negligence, by act or omission, engages in conduct that places a child younger than 15 years in imminent danger of death, bodily injury, or physical or mental impairment." Tex. Pen. Code Ann. § 22.041(c). Obviously, there are numerous ways in which one can place a child in "imminent danger of death, bodily injury, or physical and mental impairment." *See, e.g.*, *Rodriguez v. State*, 137 S.W.3d 758, 761 (Tex. App.—Houston [1st Dist.] 2004, no pet.) (driving while intoxicated with children present in vehicle); *Walker v. State*, 95 S.W.3d 516, 521 (Tex. App.—Fort Worth 2002, pet. ref'd) (evading arrest and violating traffic laws with child present in vehicle); *Contreras v. State*, 54 S.W.3d 898, 905 (Tex. App.—Corpus Christi 2001, no pet.) (failing to provide adequate nourishment to child).

"[I]t has long been the general rule that when a single crime can be committed in various ways, jurors need not agree upon the mode of commission." *Francis*, 36 S.W.3d at 124. When alternate manners and means of committing an offense are submitted to the jury in the disjunctive, it is appropriate for the jury to return a general verdict for that offense if the evidence supports a conviction under any one of them. *Kitchens*, 823 S.W.2d at 258; *Marinos v. State*, 186 S.W.3d 167, 175 (Tex. App.—Austin 2006, no pet.).

The State presented evidence of and alleged two different ways in which Garcia could have endangered the child. Officer Norell testified that Jessica told him that, during a single incident, Garcia struck her while she was holding the child and that Garcia then proceeded to pull the child away from her arms. Thus, there is evidence supporting a conviction under either of the ways Garcia could have committed the offense. In a case such as this, in which the State alleges different manners or means of committing a single offense, this satisfies the unanimity requirement. *See Marinos*, 186 S.W.3d at 175. We overrule Garcia's third and fourth issues.

**Constitutionality of section 25.07 of the penal code**

In his fifth and sixth issues, Garcia argues that section 25.07 of the penal code, which makes it an offense to violate a protective order, is facially overbroad and vague in violation of the First and Fourteenth Amendments. *See* U.S. Const. amend. I, XIV.

The penal code provision at issue provides, in relevant part:

(a) A person commits an offense if, in violation of an order issued under Section 6.504 or Chapter 85, Family Code, under Article 17.292, Code of Criminal Procedure, or by another jurisdiction as provided by Chapter 88, Family Code, the person knowingly or intentionally:

....

12

(2) communicates:

> (A) directly with a protected individual or a member of the family or household in a threatening or harassing manner;
>
> (B) a threat through any person to a protected individual or a member of the family or household; or
>
> (C) in *any manner* with the protected individual or a member of the family or household except through the person's attorney or a person appointed by the court, if the order prohibits any communication with a protected individual or a member of the family or household;

Tex. Pen. Code Ann. § 25.07(a)(2) (emphasis added).

Garcia contends that the statute is overbroad because it prohibits all communication with the protected individual, except through the protected individual's attorney or a person appointed by the court, *see id*. § 25.07(a)(2)(C), and because "harassing" or "threatening" communication may, in certain circumstances, encompass protected speech. *See id*. §§ 25.07(a)(2)(A), (B). Garcia asserts that the statute is vague because it fails to define what kind of communication is considered "harassing."

### Standard of review

Whenever we are confronted with an attack upon the constitutionality of a statute, we presume that the statute is valid and that the legislature has not acted unreasonably or arbitrarily. *Rodriguez v. State*, 93 S.W.3d 60, 69 (Tex. Crim. App. 2002). The burden rests upon the individual who challenges the statute to establish its unconstitutionality. *Id*. In the absence of contrary evidence, we will presume that the legislature acted in a constitutionally sound fashion. *Id*. We will uphold a statute if we can determine a reasonable construction that will render it constitutional and

13

carry out legislative intent. *See Sheldon v. State*, 100 S.W.3d 497, 500 (Tex. App—Austin 2003, pet. ref'd) (citing *Ely v. State*, 582 S.W.2d 416, 419 (Tex. Crim. App. 1979)).

A facial challenge to a statute—the type that Garcia asserts here—is the most difficult challenge to mount successfully because the challenger must establish that no set of circumstances exists under which the statute will be valid. *Santikos v. State*, 836 S.W.2d 631, 633 (Tex. Crim. App. 1992); *Shaffer v. State*, 184 S.W.3d 353, 364 (Tex. App.—Fort Worth 2006, no pet.); *Frieling v. State*, 67 S.W.3d 462, 473 (Tex. App.—Austin 2002, pet. ref'd).

### *Overbreadth*

In analyzing a facial challenge to the overbreadth and vagueness of a law, we first determine whether the statute reaches "a substantial amount of constitutionally protected conduct." *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494 (1982). A statute is overbroad if it sweeps within its coverage speech or other conduct protected by the First Amendment. *Clark v. State*, 665 S.W.2d 476, 482 (Tex. Crim. App. 1984). Speech is not protected by the First Amendment when it is the very vehicle of the crime itself. *Frieling v. State*, 67 S.W.3d 462, 473 (Tex. App.—Austin 2002, pet. ref'd). A statute will not be invalidated for overbreadth merely because it is possible to imagine some unconstitutional applications. *State v. Holcombe*, 145 S.W.3d 246, 250 (Tex. App.—Fort Worth 2004), *aff'd*, 187 S.W.3d 496 (Tex. Crim. App. 2006). "Because of the wide-reaching effects of striking down a statute on its face at the request of one whose own conduct may be punished despite the First Amendment, we have recognized that the overbreadth doctrine is 'strong medicine' and have employed it with hesitation, and then 'only as a last resort.'" *New York v. Ferber*, 458 U.S. 747, 769 (1982). We will not strike down a statute for

14

overbreadth unless there is "a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court." *See Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 800-01 (1984).

At the outset, we note the limited applicability of this statute. It applies only to persons who are currently subject to certain kinds of court orders. *See* Tex. Pen. Code Ann. § 25.07(a) (limiting applicability of section to persons who violate orders "issued under Section 6.504 or Chapter 85, Family Code, under Article 17.292, Code of Criminal Procedure, or by another jurisdiction as provided by Chapter 88, Family Code"); Tex. Fam. Code Ann. § 85.022(b)(2) (West 2002) (permitting court to prohibit "the person found to have committed family violence" from communicating with protected individual or "a member of the family or household of a person protected by an order"). Before a person may be subject to these types of protective orders, either the person must be arrested for stalking pursuant to section 42.072 of the penal code, *see* Tex. Code Crim. Proc. Ann. art. 17.292(a) (West Supp. 2006), or the issuing court must find "that family violence[6] has occurred and is likely to occur in the future." *See* Tex. Fam. Code Ann. § 81.001

---

[6] "Family violence" means:

(1) an act by a member of a family or household against another member of the family or household that is intended to result in physical harm, bodily injury, assault, or sexual assault or that is a threat that reasonably places the member in fear of imminent physical harm, bodily injury, assault, or sexual assault, but does not include defensive measures to protect oneself;

(2) abuse, as that term is defined by Sections 261.001(1)(C), (E), and (G), by a member of a family or household toward a child of the family or household; or

(3) dating violence, as that term is defined by Section 71.0021.

(West 2002). Also, in most cases involving family violence, the duration of a protective order cannot exceed two years. *See* Tex. Fam. Code Ann. § 85.025(a) (West 2002). In summary, section 25.07 only applies under a narrow set of circumstances to a narrow class of individuals for a limited amount of time.

With the narrow scope of the statute in mind, we first address sections 25.07(a)(2)(A) and (B), which prohibit persons from communicating "directly with a protected individual or a member of the family or household in a *threatening or harassing* manner" or from communicating "*a threat* through any person to a protected individual or a member of the family or household." Tex. Pen. Code Ann. §§ 25.07(a)(2)(A), (B) (emphasis added).

These sections do not prohibit all communication with a protected individual, but only communication that is threatening or harassing. Contrary to Garcia's assertion, threats and harassment are not entitled to First Amendment protection. *See, e.g.*, *Watts v. United States*, 394 U.S. 705, 707 (1969) ("What is a threat must be distinguished from what is constitutionally protected speech."); *Test Masters Educ. Servs. v. Singh*, 428 F.3d 559, 580 (5th Cir. 2005) (Stating that there is a "distinction between communication and harassment" and that "courts have the power to enjoin harassing communication"); *Thorne v. Bailey*, 846 F.2d 241, 243 (4th Cir. 1988) ("Prohibiting harassment is not prohibiting speech, because harassment is not protected speech."); *Webb v. State*, 991 S.W.2d 408, 415 (Tex. App.—Houston [14th Dist.] 1999, pet. ref'd) ("A threat is not protected speech."). Because these sections are limited to communication that is threatening or harassing, we

---

Tex. Fam. Code Ann. § 71.004 (West 2002).

16

conclude that they do not reach "a substantial amount of constitutionally protected conduct." *See Village of Hoffman Estates*, 455 U.S. at 494.

We next address section 25.07(a)(2)(C), which prohibits persons from communicating "in any manner with the protected individual or a member of the family or household except through the person's attorney or a person appointed by the court, if the order prohibits any communication with a protected individual or a member of the family or household." Tex. Pen. Code Ann. § 25.07(a)(2)(C). Although this section applies to any manner of communication, we again note that it only prohibits communication in the context of a pre-existing court order issued against a person who has been arrested for stalking, *see* Tex. Code Crim. Proc. Ann. art. 17.292(a), or based upon a court finding that "family violence has occurred and is likely to occur in the future." *See* Tex. Fam. Code Ann. § 81.001. The section thus has a narrowly-defined scope, limited to persons whose prior actions toward the protected individual were of such a threatening nature that a court felt justified in issuing a protective order against that person. Also, the section only applies *if* the court order prohibits any communication. Therefore, the section does not apply to all protective orders. Further, the section permits communication with the protected individual or a member of the family or household as long as it is "through the person's attorney or a person appointed by the court."

We conclude that section 25.07 does not reach a "substantial amount of constitutionally protected conduct." *See Village of Hoffman Estates*, 455 U.S. at 494. We overrule Garcia's fifth issue.

17

***Vagueness***

A statute can be void for vagueness even if it does not reach a substantial amount of constitutionally protected conduct. *City of Chicago v. Morales*, 527 U.S. 41, 52 (1999). A law is void for vagueness if its prohibitions are not clearly defined. *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). A law must give a person of ordinary intelligence a reasonable opportunity to know what is prohibited. *Id.* A law also must provide explicit standards to those who enforce and apply it. *Id.* A vague law "impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application." *Id.* at 108-09. A scienter requirement can overcome problems with vague statutory language. *See Wisenbaker v. State*, 860 S.W.2d 681, 689 (Tex. App.—Austin 1993, pet. ref'd); *see also Village of Hoffman Estates*, 455 U.S. at 499.

Section 25.07 contains a scienter requirement—the prohibited conduct must be done "knowingly or intentionally." Tex. Pen. Code Ann. § 25.07(a). Specifying an intent element, however, does not save a criminal statute from vagueness where the conduct which must be motivated by intent, as well as the standard by which that conduct is to be assessed, remain vague. *See Kramer v. Price*, 712 F.2d 174, 178 (5th Cir. 1983). The conduct at issue in this case is "harassing" communication. Garcia contends that section 25.07 is vague because it fails to define the term "harassing."[7]

In his brief, Garcia relies primarily on *Long v. State*, 931 S.W.2d 285 (Tex. Crim. App. 1996). In *Long*, the court of criminal appeals addressed the constitutionality of the 1993

---

[7] We note that a statute is not vague merely because its words or phrases are not specifically defined. *See Morgan v. State*, 557 S.W.2d 512, 514 (Tex. Crim. App. 1997); *In re Browning*, 113 S.W.3d 851, 864 (Tex. App.—Austin 2003, pet. denied). When words are not defined in a statute, they are ordinarily given their plain meaning unless the statute clearly shows that they were used in some other sense. *Daniels v. State*, 754 S.W.2d 214, 219 (Tex. Crim. App. 1988).

version of the stalking statute, focusing on the provision that made it an offense to engage in repeated conduct "that is reasonably likely to harass, annoy, alarm, abuse, torment, or embarrass " another person. *Id*. at 288. The court found that these words were "susceptible to uncertainties of meaning." *Id*. at 289. The court did not, however, focus exclusively on the term "harass," but examined it together with the surrounding words in the provision. The court found that the words "harass," "alarm," "abuse," and "torment" were "of low enough emotional intensity" that they "implicate First Amendment freedoms." *Id*. at 296. Concluding that the "legislature obviously intended low intensity emotions to trigger the statute," the court refused to save the statute by applying a narrowing construction that "increased the intensity of the conduct under scrutiny." *Id*. The court held the statute to be "unconstitutionally vague on its face." *Id*. at 297.

Two years after *Long* was decided, the supreme court directly addressed the meaning of the word "harass." *See Commission for Lawyer Discipline v. Benton*, 980 S.W.2d 425 (Tex. 1998). At issue was the constitutionality of a disciplinary rule of professional conduct that prohibited lawyers from making comments to a juror "that are calculated merely to harass or embarrass the juror or to influence his actions in future jury service." *See* Tex. Disciplinary R. Prof'l Conduct 3.06(d). The court acknowledged that, "in colloquial usage," "harass" may be considered vague. *Benton*, 980 S.W.2d at 439. However, the court stated that "we are bound" to construe the word to "avoid constitutional infirmity if possible." *Id*. Looking for guidance to statutes in other jurisdictions, "in particular criminal stalking statutes, containing definitions of the word 'harass' that have withstood vagueness challenges," the court construed "harass" to include the following elements: (1) a course of conduct, (2) directed at a specific person or persons, (3) causing or tending to cause substantial distress, and (4) having no legitimate purpose. *Id*. Although the court applied

19

this definition to a disciplinary rule, the court observed that "thus defined, 'harass' is not impermissibly vague even in a *criminal statute*." *Id*. at 439-40 (emphasis added). Having narrowly defined the term "harass," the supreme court concluded that the rule was not unconstitutionally vague. *Id*. at 442.

We are thus confronted with two possible constructions of section 25.07, one in which the statute is found to be vague because of the "low emotional intensity"[8] and "uncertain meaning" of the word "harass," *see Long*, 931 S.W.2d at 289, 296-97, and another in which the word "harass" is subject to a narrowing definition that saves the statute from "constitutional infirmity." *See Benton*, 980 S.W.2d at 439-40.

"Where a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, [the court's] duty is to adopt the latter." *State v. Edmond*, 933 S.W.2d 120, 124 (Tex. Crim. App. 1996) (quoting *United States ex rel. Attorney General v. Delaware & Hudson Co.*, 213 U.S. 366 (1909)). We are "obliged to assume that the Legislature intended the interpretation which secures the statute's constitutional application." *Id*.; *see also* Tex. Gov't Code Ann. § 311.021(1) (West 2005) (when

---

[8] We are not convinced that, as the term is used in section 25.07, "harass" is of "low emotional intensity." Unlike the former stalking statute, section 25.07 prohibits communication that is either "threatening or harassing." Tex. Pen. Code Ann. § 25.07(a)(2)(A). Whatever "harassing" means, by connecting it to the word "threatening," we believe the legislature intended it to be of higher emotional intensity than it was in the former stalking statute. *See* Tex. Gov't Code Ann. § 311.011(a) (West 1998) (statutory words are to be "read in context"); *Nguyen v. State*, 1 S.W.3d 694, 696 (Tex. Crim. App. 1999) (court "cannot interpret a phrase within a statute in isolation"); *Thomas v. State*, 919 S.W.2d 427, 430 (Tex. Crim. App. 1996) ("We always strive to give words and phrases meaning within the context of the larger provision.").

legislature enacts statute, "it is presumed that compliance with the constitutions of this state and the United States is intended").

We accordingly construe "harass" in a manner consistent with the construction adopted by the supreme court in *Benton*.[9] *See* 980 S.W.2d at 439-40. Thus defined, we hold that section 25.07 is not impermissibly vague.[10] We overrule Garcia's sixth issue.

---

[9] Garcia also contends that section 25.07 fails to clarify the standard by which "harassing" communication is to be assessed. In accordance with our incorporation into the statute of the supreme court's definition of "harass," we will also incorporate a "reasonable person" standard into section 25.07, as that is the standard used in the statutes the supreme court relied upon. *See Commission for Lawyer Discipline v. Benton*, 980 S.W.2d 425, 439 (Tex. Crim. App. 1998) (citing *Snowden v. State*, 677 A.2d 33, 36 n.1 (Del. 1996) ("'Harass' means a knowing and willful course of conduct directed at a specific person which seriously alarms, annoys, or harasses the person, and which serves no legitimate purpose. The course of conduct must be such as would cause a reasonable person to suffer substantial emotional distress, and must actually cause substantial emotional distress to the person."); *Johnson v. State*, 449 S.E.2d 94, 96 (Ga. 1994) (stating that the statute defines "harass" as "a knowing and willful course of conduct directed at a specific person which causes emotional distress by placing such person in reasonable fear of death or bodily harm to himself or herself or to a member of his or her immediate family . . . ."); *State v. Fonseca,* 670 A.2d 1237, 1238 (R.I. 1996) ("'Harasses' means a knowing and willful course of conduct directed at a specific person which seriously alarms, annoys, or harasses the person and which serves no legitimate purpose. The course of conduct must be such as would cause a reasonable person to suffer substantial emotional distress, or be in fear of bodily injury.")).

A "reasonable person" standard is also the standard approved by the court of criminal appeals. *See Long v. State*, 931 S.W.2d 285, 289-90 (Tex. Crim. App. 1996); *see also Woodson v. State*, 191 S.W.3d 280, 282 (Tex. App.—Waco 2006, pet. ref'd) ("A statute which incorporates a 'reasonable person' standard will generally be sufficient to pass constitutional muster.").

[10] Garcia asserts that the court of criminal appeals in *Long* rejected the supreme court's approach to narrowly construing the term "harass" in this manner. However, we can find nothing in *Long*, a case decided two years prior to *Benton*, that rejects or even disapproves of such an approach. In fact, the court in *Long* wrote that courts "have a general duty to employ narrowing constructions to prevent a statute from being unconstitutional." 931 S.W.2d at 295. The court did state that we "may not rewrite a statute in order to save it if it is not readily subject to a narrowing construction." *Id*. However, we are not rewriting section 25.07. We are simply defining the term "harass" in a manner consistent with the supreme court's prior definition of the term.

21

## CONCLUSION

Having overruled Garcia's issues on appeal, we affirm the judgment of the district court.

_____

Bob Pemberton, Justice

Before Chief Justice Law, Justices B. A. Smith, and Pemberton

Affirmed on Motion for Rehearing

Filed:   December 29, 2006

Publish