**AFFIRM; and Opinion Filed July 12, 2016.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-14-01202-CR

**BRIAN GAETA, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the County Criminal Court No. 11**
**Dallas County, Texas**
**Trial Court Cause No. MA13-30802**

## MEMORANDUM OPINION

Before Justices Francis, Fillmore, and Schenck
Opinion by Justice Fillmore

A jury convicted Brian Gaeta of misdemeanor assault family violence, *see* TEX. PENAL

CODE ANN. § 22.01(a)(1) (West Supp. 2015), and the trial court assessed punishment of 180

days' confinement in the county jail, probated for eighteen months. In two issues, Gaeta

contends the trial court erred by admitting the recording of a 9-1-1 call into evidence and the

evidence is insufficient to support the judgment. We affirm the trial court's judgment.

### Background

Alexis Salinas, the complainant in this case, began dating Gaeta sometime in 2012. On

April 4, 2013, Irene Chavez, Salinas's mother, called 9-1-1 and requested the assistance of the

police. Chavez reported that, "my daughter and her boyfriend had an argument and he hit her,

hit her in the mouth and she's bleeding." Chavez identified Gaeta as her daughter's boyfriend.

Grand Prairie police officer Adrian Renteria and his partner, Officer DeWault,[1] responded to the call. Renteria spoke with Gaeta while DeWault spoke with Salinas. Renteria testified Salinas told DeWault that, after becoming upset during an argument, Gaeta punched her in the face.[2] According to Renteria, Salinas was upset and crying, and her nose was "pretty bloody and bleeding profusely."

Gaeta told Renteria that he thought Salinas was going to get in the car, "so he put his foot off of the brake and the car moved." Gaeta said Salinas was injured when "his car went forward and the car door opened and accidently hit" her in the mouth. Renteria observed that the street on which Gaeta's car was parked was "flat." Renteria did not find any mechanical problem with Gaeta's car, and he could not determine how Gaeta's car would have rolled either forward or backward.

Renteria did not observe any blood in Gaeta's car and did not recall whether there was any blood on the door of the car. There was, however, blood on the ground next to a Jeep that was parked at the house. Renteria determined through his investigation that Salinas felt pain from her injuries. DeWault, as the "primary officer" in charge of the investigation, made the decision to arrest Gaeta.

Renteria believed Gaeta punched Salinas in the face and it was "very unlikely" her injuries were due to an accident. Renteria did not believe Gaeta's story because it contradicted what Salinas said had happened, but conceded at trial that, if Salinas recanted her allegations, her injuries were consistent with being struck by a car door. In Renteria's experience, as part of the "cycle of domestic violence," victims of family violence assault often recant their allegations.

---

[1] Officer DeWault's first name is not in the appellate record. The officer's last name in the reporter's record is spelled "DeWault," but is spelled "DeWalt" in the affidavit for arrest warrant in the clerk's record. We will use the spelling in the reporter's record.

[2] At the time of trial, DeWault no longer worked for the Grand Prairie police department and did not testify about his conversation with Salinas.

Salinas testified on behalf of Gaeta and denied he hit her. According to Salinas, on April 4, 2013, she had been dating Gaeta for approximately a year. They left her house, planning to get something to eat, and got into Gaeta's car. Salinas agreed that she told the police that she and Gaeta were "playfully calling each other names," and "things kind of escalated in terms of hurt feelings." She did not want to argue anymore and got out of the car. As she walked away, Gaeta honked the car's horn. She turned around to return to the car to determine what Gaeta wanted. It was dark, and she could not see that the car door was still open. When she turned around, she hit her nose on the top of the door. On cross-examination by the State, Salinas demonstrated how she was hit by the car door. During that demonstration she testified that, when she returned to the car, she opened the door and looked down into the car. She could feel the door on her back. She decided to ignore what Gaeta was saying and, as she turned around, hit her nose on the corner of the door. Salinas denied the door hit her because the car moved. She then testified that she "blacked out" and got "dizzy" when she hit the door and did not know if the car moved.

After hitting the car door, Salinas felt a "really bad pain" in her nose, put her hands to her face, and walked away from Gaeta's car. She was holding the blood from her nose in her hands and "let it go" by her stepfather's Jeep. She knocked on the door of her house because she was bleeding and wanted Chavez to open the door. Salinas initially testified that she did not tell her mother anything, and Chavez just "kind of just figured" that Gaeta hit her. When questioned as to why Chavez would think that Gaeta hit her, Salinas denied Gaeta had a temper or that "anything like this" had happened previously. Salinas then stated that Chavez asked her what happened and, because she was angry, she told Chavez that Gaeta hit her. Salinas thought Chavez would make Gaeta leave, not call the police. Because she was still angry when the police arrived, Salinas told them that Gaeta hit her.

–3–

Salinas continued dating Gaeta for six months after he was arrested, but was no longer dating him at the time of trial. Salinas testified she and Gaeta never discussed the charges against him, the status of the criminal case, or the fact that she lied to the police. Salinas admitted she failed to respond to multiple attempts by the State through letters, telephone calls, and personal visits to contact her. Salinas thought the case "had gone away" and she did not respond to the attempts to contact her because she "just didn't want anything to do with it." She testified she came to court because " I took my mom's advice, and I came here to say the truth and apologize." However, Salinas also testified she had not discussed with Chavez, or anyone else, that she had lied about Gaeta hitting her.

The jury convicted Salinas of misdemeanor assault family violence. After a punishment hearing, the trial court sentenced Salinas to 180 days' confinement in the county jail and probated the sentence for eighteen months.

## Admissibility of 9-1-1 Call

In his first issue, Gaeta contends the trial court's admission of the recording of the 9-1-1 call made by Chavez violated his right under the Sixth Amendment of the United States Constitution to confront the witnesses against him because the State failed to establish that Chavez was unavailable to testify or that the statements she made during the 9-1-1 call were nontestimonial.

### Relevant Facts

The trial court held a pre-trial hearing on the admissibility of the recording of the 9-1-1 call. The only evidence presented at the hearing was the recording. In the recording, Chavez[3] requested assistance from the police because "my daughter and her boyfriend had an argument and he hit her, hit her in the mouth and she's bleeding." The 9-1-1 operator, identified at trial as

---

[3] Although Chavez did not identify herself during the call, it is undisputed that she made the call.

–4–

Dawn Fincher, requested the address at which the incident occurred and asked whether that location was a house or an apartment. After confirming that only Chavez's daughter and the daughter's boyfriend were involved in the altercation and the daughter was hit in the mouth, Fincher asked, "Is he still there?" Fincher was required to ask the question twice before Chavez responded. During the delay, male voices can be heard yelling and cursing in the background. Chavez told Fincher, "He's still here."

Fincher repeated the address provided by Chavez and requested that Chavez confirm it was the address at which the incident occurred. Rather than answering Fincher's question, Chavez asked someone, "Why did he hit you?" Fincher instructed Chavez not to "ask why," but to answer her questions. Fincher then asked two times for the boyfriend's name before Chavez responded, "Brian Gaeta." In response to Fincher's questions, Chavez indicated Gaeta was an Hispanic, was 18 years old, and had arrived at the house in a vehicle. Fincher asked what type of vehicle, "in case he tries to leave." Again, a male voice can be heard in the background. Chavez responded, "I don't know," but then states, "It's a green Mazda." Fincher instructed Chavez and her daughter to go inside the house and leave "him" outside so that Fincher would know they were "safe until the officers [got] there." Chavez began instructing someone to go inside the house. The call ends when the police officers arrive.

The State argued the recording "should be deemed not testimonial" because there was an "ongoing emergency." The State specifically argued there was "scuffling in the background," "people are yelling," "it sounds like someone is crying," and Fincher was instructing Chavez and her daughter to leave Gaeta outside and go inside the house where it was safe. Gaeta's counsel responded that there was "some *Brady* material" that showed the "version that was presented by my client is consistent with the injuries." Gaeta's counsel argued that the voices on the recording had not been identified and "if she's not here for me to directly cross-examine her on

some of the statements that were made by my client at the scene that the police officer says are consistent with the injuries sustained by the complainant in this case, my client's Sixth Amendment rights, his right to confrontation, is clearly violated." Gaeta's counsel asserted that "her presence and my ability to cross-examine her is necessary so that my client can have adequate and proper defense in this case."

The trial court asked Gaeta's counsel to respond to the State's argument that there was an ongoing emergency and the primary purpose of the call was to receive emergency services. Gaeta's counsel stated:

> [W]ithout disclosing my strategy, all I can tell you at this point – and I think I've disclosed a good portion of my strategy so that I'm able to make a portion of my argument to the Court as to why this needs to be admitted [sic].
>
> But, without disclosing the entirety of my defense, if the mom is not here for me to cross-examine, then I'm unable to put on my client's defense.

After the trial court listened to the recording two more times, Gaeta's counsel continued:

> [A]s the audio progresses, there are other voices; there are other people. I do not have the ability to confront the witness, the mom, allegedly the mom, and ask her who else was present.
>
> Because it is our position and, like I said, without giving away too much of our defense, it is our position that there were a lot of people at that location who were not listed on the police report; and I believe that I should have the opportunity to ask her who else was there and find out who else was there. You just have a bunch of voices. We don't know who they are. We don't know anything about those voices, who they are. . . .
>
>             . . . .
>
>             . . . But my position is that the admission of this tape in its entirety because of the fact that I cannot ask her about who was there, who else was present, who said what, my position is that the admission of this audio tape in its entirety is a violation of my client's Sixth Amendment rights.

The trial court ruled the recording of the 9-1-1 call was admissible.

The trial court then stated, "it's my understanding that the complainant's mother is unavailable." The State responded, "At this point, yes, but that may change." The State did not offer any evidence about why Chavez was unavailable to testify.

The State called Fincher to testify at trial. When the State offered the recording of the 9-1-1 call, Gaeta's counsel requested the trial court, "note my previous objections." The trial court overruled the objections and admitted the recording of the 9-1-1 call into evidence.

*Analysis*

The Confrontation Clause of the Sixth Amendment provides that, in all criminal prosecutions, the accused has the right to be confronted with the witnesses against him. U.S. CONST. amend. VI; *Crawford v. Washington*, 541 U.S. 36, 42 (2004).[4] Testimonial out-of-court statements by a witness absent from trial are barred by the Confrontation Clause unless (1) the witness is unavailable to testify at trial, and (2) the defendant had a prior opportunity to cross-examine the witness. *Crawford*, 541 U.S. at 59; *Paredes v. State*, 462 S.W.3d 510, 514 (Tex. Crim. App.), *cert. denied*, 136 S. Ct. 483 (2015). Once a defendant raises a Confrontation Clause objection, the burden shifts to the State to prove either (1) the statement does not contain testimonial hearsay and thus does not implicate the Confrontation Clause, or (2) the statement contains testimonial hearsay but is nevertheless admissible. *De la Paz v. State*, 273 S.W.3d 671, 680–81 (Tex. Crim. App. 2008).

We turn first to Gaeta's argument that the trial court erred by admitting the recording of the 9-1-1 call because the State failed to establish Chavez's statements during the call were

---

[4] The Sixth Amendment is binding on the States through the Fourteenth Amendment. *Pointer v. Texas*, 380 U.S. 400, 403 (1965).

nontestimonial.[5] Whether a statement is testimonial is a question of law that we review de novo. *Langham v. State*, 305 S.W.3d 568, 576 (Tex. Crim. App. 2010).

Only testimonial statements "cause the declarant to be a 'witness' within the meaning of the Confrontation Clause." *Davis v. Washington*, 547 U.S. 813, 821 (2006). A statement should be considered "testimonial" if it constitutes a solemn declaration made for the purpose of establishing some fact. *Crawford*, 541 U.S. at 51. While the Court declined in *Crawford* to provide a comprehensive definition of a "testimonial" statement, it advised that certain classes of "core" statements could be testimonial for purposes of the Confrontation Clause, including: (1) "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial," and (2) "[s]tatements taken by police officers in the course of interrogations[.]" *Id.* at 51–52; *see also Paredes*, 462 S.W.3d at 514.

In *Davis*, the Supreme Court specifically addressed whether statements made to law enforcement personnel during a 9-1-1 call are "testimonial" statements subject to the requirements of the Confrontation Clause, *Davis*, 547 U.S. at 817, 822, and concluded such statements were testimonial when the circumstances objectively indicated there was no ongoing emergency, and that "the primary purpose of the interrogation [was] to establish or prove past events potentially relevant to later criminal prosecution." *Davis*, 547 U.S. at 822; *see also Coronado v. State*, 351 S.W.3d 315, 324 (Tex. Crim. App. 2011). Conversely, the statements would be nontestimonial "when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of interrogation [was] to enable police assistance to meet an ongoing emergency." *Davis*, 547 U.S. at 822; *see also Coronado*, 351 S.W.3d at 324.

---

[5] Gaeta complains only about Chavez's statements on the recording of the 9-1-1 call. Fincher, the 9-1-1 operator, testified at trial and, therefore, her questions to Chavez, even if testimonial in nature, did not violate the Confrontation Clause. *See Crawford*, 541 U.S. at 59 n.9 ("[W]hen the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements.").

The existence of an ongoing emergency "is relevant to determining the primary purpose of the interrogation because an emergency focuses the participants on something other than 'proving past events potentially relevant to later criminal prosecution,'" and "is among the most important circumstances informing the 'primary purpose' of an interrogation." *Michigan v. Bryant*, 562 U.S. 344, 361 (2011); *Davis*, 547 U.S. at 822, 828–30. The Confrontation Clause does not require such statements to be subject to cross-examination in order to be admissible because "the prospect of fabrication in statements given for the primary purpose of resolving that emergency is presumably significantly diminished." *Bryant*, 562 U.S. at 361. "To determine whether the 'primary purpose' of an interrogation is to 'enable police assistance to meet an ongoing emergency,' which would render the resulting statements nontestimonial, we objectively evaluate the circumstances in which the encounter occurs and the statements and actions of the parties." *Id.* at 359 (internal citations omitted); *see also Coronado*, 351 S.W.3d at 324 n.50. The focus is "on the objective purpose of the interview or interrogation, not on the declarant's expectation." *Coronado*, 351 S.W.3d at 324; *see also Bryant*, 562 U.S. at 359–60.

A 9-1-1 call initiated to summon police assistance is generally nontestimonial because it is "a cry for help" or "the provision of information enabling officers to end a threatening situation." *Garcia v. State*, 212 S.W.3d 877, 883 (Tex. App.—Austin 2006, no pet.); *see also Davis*, 547 U.S. at 832. However, a 9-1-1 call which begins as an interrogation to determine the need for emergency assistance may evolve into testimonial statements once that purpose has been achieved. *Davis*, 547 U.S. at 828. In determining whether a statement was made during an ongoing emergency, we consider whether: (1) the situation was still in progress; (2) the questions sought to determine what was presently happening as opposed to what had happened in the past; (3) the primary purpose of the interrogation was to render aid rather than to memorialize a possible crime; (4) the questioning was conducted in a separate room, away from the alleged

attacker; and (5) the events were deliberately recounted in a step-by-step fashion. *Davis*, 547 U.S. at 829–30; *Vinson v. State*, 252 S.W.3d 336, 339 (Tex. Crim. App. 2008).

At the pretrial hearing on Gaeta's Confrontation Clause objection, the State played the recording of the 9-1-1 call for the trial court and argued that Chavez's statements in the recording were nontestimonial because there was an ongoing emergency. Gaeta argues on appeal that the State failed to establish there was an ongoing emergency because it offered no evidence of his location at the time of the 9-1-1 call or that Chavez was in any danger. Gaeta failed to raise this argument in the trial court, even when requested by the trial court the respond to the State's argument that there was an ongoing emergenecy. Rather, he simply argued it was crucial to his defense to cross-examine Chavez about who else was present at the time of the 9-1-1 call. We, therefore, question whether he has preserved this argument for our review. *See* Tex. R. App. P. 33.1(a); *Clarke v. State*, 270 S.W.3d 573, 582 (Tex. Crim. App. 2008) (concluding that, to preserve error for appellate review, "a particular argument relied upon on appeal must have been presented to the trial court"); *Reyna v. State*, 168 S.W.3d 173, 179 (Tex. Crim. App. 2005) ("Because [defendant] 'did not clearly articulate' that the Confrontation Clause demanded admission of the evidence, the trial judge 'never had the opportunity to rule upon' this rationale.").

However, even if preserved, Gaeta's argument has no merit. The recording of the 9-1-1 call reflects that the situation at Salinas's house had not resolved. Rather, Gaeta was still at the house and various individuals were screaming, crying, and cursing. Fincher's questions to Chavez focused on the nature of the disturbance, the location where the police were needed, where Gaeta was located, and what vehicle Gaeta would be driving if he left the house. These questions sought to determine what was presently happening at the location and to direct the responding officers seeking to render aid to Chavez. Fincher was also concerned for Chavez's

–10–

and Salinas's safety and instructed them to go into the house, away from Gaeta. We conclude the statements made by Chavez during the 9-1-1 call related to an ongoing emergency and were nontestimonial in nature.

Chavez's nontestimonial statements during the 9-1-1 call do not implicate the Confrontation Clause. *See Davis*, 547 U.S. at 821; *De la Paz*, 273 S.W.3d at 680–81. Accordingly, the trial court did not err by overruling Gaeta's objection under the Confrontation Clause to the admissibility of those statements. We resolve Gaeta's first issue against him.[6]

## Sufficiency of the Evidence

In his second issue, Gaeta asserts the evidence is insufficient to support the jury's determination that he assaulted Salinas or the trial court's affirmative finding of family violence based on a dating relationship. We review the sufficiency of the evidence under the standard set out in *Jackson v. Virginia*, 443 U.S. 307 (1979). *Fernandez v. State*, 479 S.W.3d 835, 837 (Tex. Crim. App. 2016). We examine all the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson,* 443 U.S. at 319; *Fernandez*, 479 S.W.3d at 837–38. This standard recognizes "the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319; *see also Adames v. State*, 353 S.W.3d 854, 860 (Tex. Crim. App. 2011). The fact finder is entitled to judge the credibility of the witnesses, and can choose to believe all, some, or none of the testimony presented by the parties. *Chambers v. State*, 805 S.W.2d 459, 461 (Tex. Crim. App. 1991); *see also Wise v. State*, 364 S.W.3d 900, 903

---

[6] Because we have determined Chavez's statements were nontestimonial, we need not address Gaeta's argument that, because the State failed to establish Chavez was unavailable to testify, the trial court erred by overruling his objection that admitting the recording of the 9-1-1 call violated his right to confront the witnesses against him. *See* TEX. R. APP. P. 47.1.

(Tex. Crim. App. 2012) ("The factfinder exclusively determines the weight and credibility of the evidence.").

We defer to the fact finder's determinations of credibility, and may not substitute our judgment for that of the fact finder. *Jackson*, 443 U.S. at 319; *Thornton v. State*, 425 S.W.3d 289, 303 (Tex. Crim. App. 2014); *King v. State*, 29 S.W.3d 556, 562 (Tex. Crim. App. 2000) (in conducting legal sufficiency analysis, appellate court "may not re-weigh the evidence and substitute our judgment for that of the jury"). When there is conflicting evidence, we must presume the fact finder resolved the conflict in favor of the verdict, and defer to that resolution. *Jackson*, 443 U.S. at 326; *Blea v. State*, 483 S.W.3d 29, 33 (Tex. Crim. App. 2016). Circumstantial evidence is as probative as direct evidence and, alone, can be sufficient to establish guilt. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). Evidence is sufficient if "the inferences necessary to establish guilt are reasonable based upon the cumulative force of all the evidence when considered in the light most favorable to the verdict." *Wise*, 364 S.W.3d at 903.

Gaeta first argues the evidence is insufficient to support the jury's finding that he assaulted Salinas because the "credible evidence" established that Salinas was accidentally injured. As relevant to this appeal, a person commits assault by intentionally, knowingly, or recklessly causing bodily injury to another. TEX. PENAL CODE ANN. § 22.01(a)(1). "Bodily injury" includes "physical pain" or an "impairment of physical condition." *Id*. § 1.07(a)(8).

The jury heard from Renteria that Salinas told DeWault that Gaeta hit her. In the 9-1-1 call, Chavez told Fincher that Gaeta hit "her daughter" in the mouth and she was bleeding. Renteria saw that Salinas's nose was "pretty bloody," and there was a pool of blood on the ground. The jury saw photographs of Salinas's injuries. Gaeta told Renteria that Salinas was injured when he took his foot off the brake, the car rolled forward, and the open door hit Salinas

–12–

in the "mouth." Although Renteria admitted Salinas's injuries were consistent with being accidently being hit by the car door, he did not believe that she was accidently injured. Further, the street on which Gaeta's car was parked was flat and, during his investigation, Renteria discovered no condition that would cause the car to roll forward. Finally, Renteria testified that many victims of domestic violence recant their allegations.

Salinas admitted that she and Gaeta were arguing on the day she was injured, but denied Gaeta hit her. After initially testifying that Chavez "just figured" that Gaeta hit her, Salinas testified she was angry and lied to Chavez, as well as to the police, about Gaeta hitting her. Salinas also gave inconsistent descriptions of how she was injured by the car door; first stating she hit the open door as she turned back toward the car and then claiming she was standing inside the car door when she turned and hit her nose. Salinas was not aware that Gaeta had told Renteria the door hit Salinas when the car rolled forward, and testified she did not remember the car moving. She then claimed she hit the door of the car so hard that she "blacked out" and became dizzy, and she did not know if the car moved.

Salinas continued to date Gaeta after the incident, but testified they never discussed the case and that Gaeta never asked why she lied to the police. Although the State repeatedly tried to contact Salinas about the case, she did not respond and thought the case had "gone away." Finally, although she admitted she never discussed with Chavez the fact that she lied about Gaeta hitting her, Salinas claimed she appeared on the day of trial to testify because Chavez advised her to "tell the truth and apologize."

The jury, as the fact finder, was the judge of the credibility of the witnesses and could choose to believe all, some, or none of the testimony presented. *Chambers*, 805 S.W.2d at 461; *see also Wise*, 364 S.W.3d at 903. The jury, therefore, could believe the evidence that Gaeta struck Salinas in the face with his hand and could determine Salinas's recantation was not

credible. *See Chambers*, 805 S.W.2d at 461 (concluding complainant's recantation did not destroy probative value of evidence of abuse, stating "[t]he jury observed the complainant's demeanor and was entitled not only to reconcile any such conflicts, but even to disbelieve her recantation"); *Saldana v. State*, 287 S.W.3d 43, 60 (Tex. App.—Corpus Christi 2008, pet. ref'd) ("A fact finder is fully entitled to disbelieve a witness's recantation."); *Hernandez v. State*, 280 S.W.3d 384, 386 (Tex. App.—Amarillo 2008, no pet.) (concluding evidence was sufficient to support family violence conviction because jury heard victim's statements made on night of assault that defendant assaulted her and could have disregarded victim's recantation). In convicting Gaeta of assault, the jury resolved the conflicting evidence in this case and made a credibility determination to believe Salinas's initial statement that Gaeta hit her. We afford almost complete deference to this determination. *See Jackson*, 443 U.S. at 319; *Thornton*, 425 S.W.3d at 303.

We conclude a rational fact finder could have found that, during an argument, Gaeta hit Salinas in the face with his hand, causing her bodily injury. Accordingly, the evidence was sufficient to support the jury's finding that Gaeta assaulted Salinas.

Gaeta also asserts the evidence is insufficient to support the trial court's affirmative finding that he committed family violence. In an assault case under section 22.01 of the penal code,[7] if the trial court determines the offense involved family violence, as defined by section 71.004 of the family code, the trial court is required to make an affirmative finding of that fact and enter it into the judgment. TEX. CODE CRIM. PROC. ANN. art. 42.013 (West 2006). The definition of "family violence" in section 71.004 of the family code includes "dating violence," as defined by section 71.0021 of the family code. TEX. FAM. CODE ANN. § 71.004(3) (West Supp. 2015). "Dating violence" includes an act, other than a defensive measure to protect

---

[7] Section 22.01 of the penal code falls under Title 5, "Offenses Against the Person," of the penal code.

oneself, by an actor that is committed against a victim with whom the actor has or has had a dating relationship that is intended to result in, among other things, bodily injury. *Id.* § 71.0021(a). A "dating relationship" means:

> [A] relationship between individuals who have or have had a continuing relationship of a romantic and intimate nature. The existence of such a relationship shall be determined based on consideration of:
>
> (1) the length of the relationship;
>
> (2) the nature of the relationship; and
>
> (3) the frequency and type of interaction between the persons involved in the relationship.

TEX. FAM. CODE ANN. § 71.0021(b).

Salinas testified that, on April 4, 2013, she had been dating Gaeta for approximately a year. During the 9-1-1 call, Chavez told Fincher that "my daughter's boyfriend . . . hit her in the mouth[.]" Renteria testified that Gaeta and Salinas had a boyfriend/girlfriend relationship. We conclude there was sufficient evidence for the trial court to find that Salinas and Gaeta had a dating relationship and Gaeta committed an act of dating violence against her. Accordingly, the trial court was required to make an affirmative finding that Gaeta committed family violence. We resolve Gaeta's second issue against him.

We affirm the trial court's judgment.

/Robert M. Fillmore/
_____
ROBERT M. FILLMORE
JUSTICE

Do Not Publish
TEX. R. APP. P. 47

141202F.U05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

BRIAN GAETA, Appellant

No. 05-14-01202-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the County Criminal Court No. 11, Dallas County, Texas,
Trial Court Cause No. MA13-30802.
Opinion delivered by Justice Fillmore,
Justices Francis and Schenck participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.


Judgment entered this 12th day of July, 2016.