PD-0659-15
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 12/28/2015 9:45:46 PM
Accepted 12/29/2015 4:44:21 PM
ABEL ACOSTA
CLERK

NO. PD-0659-15

IN THE

COURT OF CRIMINAL APPEALS

OF TEXAS

_____

**PAUL HENRI WAGNER, Appellant**

**v.**

**THE STATE OF TEXAS, Appellee**

_____

**APPELLANT'S BRIEF ON THE MERITS**

_____

No. 05-13-01329-CR
In the
Fifth District Court of Appeals at Dallas

_____

On appeal from Cause Number MA-1114870-L
In County Criminal Court No. 10
of Dallas County, Texas
Honorable Roberto Canas, Judge Presiding

_____

DAN WOOD, JR.
ATTORNEY AT LAW
4303 N. Central Expressway
Dallas, Texas  75205
Tel. (214) 559-8815
Fax (214) 696-0867
Email: danwoodjr@sbcglobal.net

VINCENT W. PERINI
ATTORNEY AT LAW
2501 Oak Lawn Ave., #560
Dallas, Texas  75219-4082
Tel. (214) 750-7477
Fax (214) 521-5690
Email: vperini@airmail.net

*Attorneys for Appellant*

FILED IN
COURT OF CRIMINAL APPEALS

December 29, 2015

ABEL ACOSTA, CLERK

# IDENTITIES OF JUDGE, PARTIES AND COUNSEL

A complete list of the names of the trial judge, all parties and counsel are as follows:

| | |
|---|---|
| Trial Judge: | Hon. Roberto Canas, County Criminal Court No. 10, Dallas County, Texas |
| Parties: | Paul Henri Wagner, Appellant |
| | State of Texas, Appellee |
| Attorneys for the Appellant: | Vincent W. Perini, Trial Counsel and Counsel on Appeal 2501 Oak Lawn Ave., Suite 560 Dallas, TX 75219-4082 |
| | Dan Wood, Jr., Counsel on Appeal 4303 N. Central Expressway Dallas, TX 75205 |
| Attorneys for the State: | Hon. Susan Hawk Criminal District Attorney Crowley Courts Building 133 N. Riverfront Blvd., LB19 Dallas, Dallas County, TX 75207 |
| | Ms. Josi Diaz, Asst. Criminal District Attorney, Trial Counsel |
| | Ms. Christine S. Ou, Asst. Criminal District Attorney, Counsel on Appeal |

**TABLE OF CONTENTS**

                                                                            **Page**

IDENTITIES OF PARTIES AND COUNSEL ............................................ ii

INDEX OF AUTHORITIES.................................................................. iv-v

STATEMENT OF THE CASE................................................................ 1-2

STATEMENT OF PROCEDURAL HISTORY.......................................... 2

ISSUES  PRESENTED………………………………….......................... 2-3

STATEMENT OF FACTS………………………………………….......... 3-11

SUMMARY OF ARGUMENT…………………………………..…… 12-13

ARGUMENT AND AUTHORITIES:

<u>First Question Presented for Review</u>: **WHAT IS THE CORRECT DEFINITION OF THE PHRASE "COMMUNICATING ... IN A ... HARASSING MANNER" AS USED IN THE STATUTE FOR PROTECTIVE ORDERS IN FAMILY VIOLENCE CASES, AND, AS APPLIED IN THIS CASE, DID IT PENALIZE PROTECTED SPEECH IN VIOLATION OF PETITIONER'S FIRST AMENDMENT RIGHTS? [TEX.PEN. CODE §25.07(A)(1)(A)]**............... 13

<u>Second Question Presented for Review</u>: **WHETHER THIS IS A "CONTENT-BASED" FIRST AMENDMENT CASE AND OUGHT TO HAVE BEEN DECIDED BY A DIFFERENT STANDARD OF REVIEW, "STRICT SCRUTINY" AS ENUNCIATED IN THE CASE OF *EX PARTE LO*** .................................................................. 27

<u>Third Question Presented for Review</u>: **IF STRICT SCRUTINY IS THE PROPER STANDARD OF REVIEW, WHETHER THE  CORRECT STANDARD OF REVIEW CAN BE WAIVED** ............... 27

PRAYER FOR RELIEF................................................................. 32

CERTIFICATES OF SERVICE AND COMPLIANCE ............................. 33

# INDEX OF AUTHORITIES

**Cases** **Page**

*Baird v. State,* 398 S.W.3d 220 (Tex. Crim. App. 2013) ............................. 19

*Bynum v. State,* 767 S.W.2d 769 (Tex. Crim. App. 1989) .......................... 17

*Cain v. State*, 947 S.W.2d 262 (Tex. Crim. App. 1997) .............................. 29

*Clark v. State,* 665 S.W.2d 476 (Tex. Crim. App. 1984) ............................ 17

*Commission for Lawyer Discipline v. Benton*, 980 SW2d 425 (Tex. 1998).. 22,24

*Ely v. State*, 582 S.W.2d 416, (Tex.Crim. App. 1979)……………………. 14,28

*Ex Parte Lo*, 424 S.W.3d 10 (Tex. Crim. App. 2013) …………..………… 14,27,31

*Garcia v. State*, 212 S.W.3d 877, (Tex. App. – Austin 2006)……………... 22,23

*Gresham v. Peterson*, 225 F.3d 899 (7th Cir. 2000) ..................................... 32

*Harvey v. State*, 78 S.W.3d 368 (Tex. Crim. App. 2002)………………….. 15

*Village of Hoffman Estates v. Flipside, Hoffman Estates, 455 U.S. 489 (1981)*……………………………………………………………………… 16

*Kramer v. Price,* 712 F.2d 174 (5th Cir. 1983) ............................................ 17

*Long v. State*, 931 S.W. 2d 285 (Tex. Crim. App. 1996)…………………... 17

*Mahaffey v. State*, 364 S.W.3d 908 (Tex. Crim. App. 2012) ....................... 20

*Marin v. State*, 851 S.W.2d 275-80 (Tex.Crim. App. 1993) ........................ 29

*May v. State*, 765 S.W.2d (Tex. Crim. App. 1989) ...................................... 16

*Patton v. State*, 835 S.W.2d 684 (Tex. App-Dallas, 1992, no pet.)……....... 19,20

*Snowden v. State*, 677 A.2d 33 (Delaware 1996) ........................................ 23

*Thompson v. State*, No. PD-1371-13 (Tex. Crim. App. 2014) ..................... 29

*Wagner v. State*, No. 05-13-01329-CR, (Tex.App.-Dallas, May 5, 2015) (Mem. Op.) ………………………………………………………………… 2,19

**Statutes and Rules**

Texas Disciplinary Rules of Professional Conduct, Section 3.06 [d] …… 22

TEX.PEN. CODE §21.15(b)(1) ........................................................................ 29

TEX.PEN. CODE §25.07(a)(2)(A)…………...............……………………… *passim*

TEX.PEN. CODE 25.07 (g) ……………………………………............…..... 14-15

TEX.PEN. CODE §42.07……………………………………………….......... 16

TEX.FAM. CODE §6.702…………………………………………………….. 25

TEX.FAM. CODE, §6.505(b) ........…………………………….....………… 25

TEX.R.EVID. 403 .......................................................................................... 8, FN4

TEX.R.EVID. 404(b) ...................................................................................... 8, FN4

## Constitutional Provisions

U.S. CONST. AMEND. IV…………………………………………….……… 15

U.S. CONST. AMEND. XIV ........................................................................ 15

## Secondary Material

New Oxford Annotated Bible, Oxford University Press, New York, 1973... 6,FN2

Webster's Encyclopedic Unabridged Dictionary 645 (1989) ……………… 20

# IN THE COURT OF CRIMINAL APPEALS

## OF TEXAS

---

### PAUL HENRI WAGNER, Appellant

### v.

### THE STATE OF TEXAS, Appellee

---

### APPELLANT'S BRIEF ON THE MERITS

---

**TO THE HONORABLE JUDGES OF THE COURT OF CRIMINAL APPEALS:**

**NOW COMES,** Paul Henri Wagner, Appellant in this cause and Petitioner herein, by and through his attorneys of record, Dan Wood, Jr. and Vincent W. Perini, and pursuant to the provision of Texas Rules of Appellate Procedure 69, *et seq.*, urges this Court to grant relief for errors made in the Court of Appeals, and in support will show as follows:

### STATEMENT OF THE CASE

Appellant was charged by information (CR: 11) with the Class "A" Misdemeanor crime of Violation of a Protective Order prohibition against "communicating with a protected party in a threatening or *harassing* manner," *See,*

TEX. PEN. CODE §25.07(a)(1)(A) (West 2012). Appellant entered a plea of Not Guilty, and was tried before a jury (RR2: 49). Appellant was found guilty (RR3: 132). Appellant waived the jury on punishment, and punishment was determined by the Court as follows: 365 days in jail, suspended, and the Defendant placed on community supervision for 24 months, plus a fine of $375.00 (RR3: 139). Judgment was entered (CR: 14-15).

The defendant filed a *Combined Motion for New Trial and Motion for Arrest of Judgment*, which was timely presented to the Court (CR: 43;RR4: 7). The combined motions were supported by defendant's affidavit (CR: 58-62). A hearing was held on August 29, 2013, after which the trial court denied the motions (RR4: 26). Appellant gave timely Notice of Appeal (CR: 13).

## STATEMENT OF PROCEDURAL HISTORY

The Fifth Court of Appeals affirmed Appellant's conviction in its opinion in *Wagner v. State*, No. 05-13-01329-CR, (Tex. App.-Dallas, delivered May 5, 2015) (Mem. Op.) (Not designated for publication). The Petition for Discretionary Review was timely filed. Review was granted on November 11, 2015 and this initial brief on the merits is timely filed.

## ISSUES PRESENTED

### First Question Presented for Review

**WHAT IS THE CORRECT DEFINITION OF THE PHRASE "COMMUNICATING ... IN A ... HARASSING MANNER" AS USED IN THE**

**STATUTE FOR PROTECTIVE ORDERS IN FAMILY VIOLENCE CASES, AND, AS APPLIED IN THIS CASE, DID IT PENALIZE PROTECTED SPEECH IN VIOLATION OF PETITIONER'S FIRST AMENDMENT RIGHTS? [TEX.PEN. CODE §25.07(A)(1)(A)].**

## Second Question Presented for Review

**WHETHER THIS IS A "CONTENT-BASED" FIRST AMENDMENT CASE AND OUGHT TO HAVE BEEN DECIDED BY A DIFFERENT STANDARD OF REVIEW, "STRICT SCRUTINY" AS ENUNCIATED IN THE CASE OF *EX PARTE LO*?**

## Third Question Presented for Review

**IF STRICT SCRUTINY IS THE PROPER STANDARD OF REVIEW, WHETHER THE CORRECT STANDARD OF REVIEW CAN BE WAIVED?**

## STATEMENT OF FACTS

Appellant and his wife, Laura Wagner, the complainant, separated in October, 2011(RR3: 32). They had been married for three years (RR5: Defendant's Exhibit 3).

They lived together in the City of Cedar Hill, Dallas County, with their two-year-old daughter (RR3: 23-26). They owned their own home and attended a nondenominational "Evangelical Mainline," "full gospel," charismatic, Pentecostal-style church, *Mountain Creek Community Church* (RR3: 90-91; RR4: 10). Mrs. Wagner was not employed outside the home (RR3: 32). Appellant was a veteran of the war in Iraq and continued to serve the Marine Corps on a regular basis in the Reserves (RR3: 94-95) [A Staff Sergeant/Combat Marksmanship Trainer with

3

Secret Clearance, periodically away from home on training missions (CR: 59; RR3:94-95; RR5: Defendant's Exhibit 3)], and complainant and their daughter were covered by Tricare (Marine Corps) health insurance (RR3: 94-95).

The Dallas County District Attorney's office sought a Protective Order on the wife's behalf against Appellant which was granted following a hearing and delivered to Appellant (RR5: State's Exhibit 1). The order was issued November 16, 2011 (RR5: State's Exhibit 1). Among other things, the protective order prohibited Appellant communicating directly with complainant "in a threatening or harassing manner." (RR5: State's Exhibit 1). This prosecution was for a violation of that provision of the protective order.

The State offered evidence that Appellant and Mrs. Wagner, exchanged text messages and Emails (RR5: State's Ex. 2 and 3), and that Appellant telephoned and left some voicemail messages over a period of 22 days beginning November 17, 2011 until Mrs. Wagner complained to the Cedar Hill police on December 8, 2011 (RR3: 104-106).

*Text Messages*

The first communication was a text message November 17 from Mrs. Wagner to Appellant. "I pray for u [Sic] every day. That you would be humbled in the sight

of the Lord and redeemed" (RR5: State's Ex. 2, first page).[1] The following day, November 18, at 9:56 a.m. Appellant responded in kind with a text message, "I pray for you every day too" (RR5: State's Ex. 2, first page). Then Appellant texted, "I'll be getting some money next week and will pay bills." Twelve minutes later at 10:08 a.m., wife responded with a question, "Did you get a job?" (RR5: State's Ex. 2). A few minutes after that wife texted, "Where is the money coming from? Did you get unemployment?" (RR5: State's Ex. 2). At 11:11 a.m., Appellant texted wife, "Do you have an attorney? My attorney has asked b/c [Sic] he would want to talk with him/her." (RR5: State's Ex. 2). There were no further communications until later that day.

Asked at trial what kind of contact the defendant had with her, Mrs. Wagner acknowledged that he was replying to her requests (RR3: 30). "There were things according to our child, bills, and finances. I was unemployed. I needed to talk to him about bank accounts…" (RR 3:28-29), "to address bills, issues dealing with our child, finances," she said (RR3: 29).

Later on November 18, from 5:34 p.m. until 6:16 p.m., about 50 minutes, there were four more text messages, two from him and two from her (RR5: State's Ex. 2,

---

[1] State's Exhibit 2 is comprised of text messages printed out on four pages which are not numbered. Appellant will refer to the pages as "first page," "second page," et seq. For ease in consulting the record, recitation of communications are grouped by exhibit numbers, one each for Text, Emails, and Telephone. Within each group the communications are in chronological order.

first page). Appellant wanted to talk, but Ms. Wagner said it would be "best to not talk except through email" and she admonishes him to respect her wishes (RR5: States Ex. 2).

There were no more text messages for five days.

On November 23, he texted a single sentence to her, "I miss you so much Laura." (RR5: State's Ex. 2, second page). There were no texts the next day.

Two days later on November 25, there was an exchange of text messages (RR5: State's Ex. 2, second page). At the end, Appellant expressed his love and that he "wants to be Ephesians 5:25-30" for her.[2] She texted him the next day, and in his response he said, "[D]on't be cold toward me." (RR5: States Exhibit 2).

*Emails*

The first email exchange was November 19, an expression of his love for her, invoking religion ("Laura, you are in my prayers every day, that God would protect and provide, that you would be full of joy and praise to the Lord, that you would no longer fear but take comfort in the peace that surpasses all understanding… .") (RR5: States Exhibit 3, page 7).[3]

---

[2] "Husbands, love your wives, as Christ loved his church and gave himself up for her, that he might sanctify her, cleanse her by the washing of water with the words… That she might be holy and without blemish. Even so, husbands should love their wives as their own bodies… etc." *Ephesians* 5:25 et seq. [New Oxford Annotated Bible, Oxford University Press, New York, 1973.]

[3] The pages are numbered in State's Exhibit 3, but the emails themselves are not in sequence by date. By its date on the face of the email, this was the earliest, but it does not appear on page 1 but on page 3 of the exhibit.

The remainder of the emails in Exhibit 3, covering 10 pages, are similar to the text messages, a mixture of family business matters, including the health of the child and health insurance, interspersed with pleas from him that she not divorce him but to give him another chance, most often invoking God's will (RR5: State's Ex. 3, pp. 1-10).

State's Exhibit 4 is a single email of four pages dated December 5, 2011 (RR5: States Ex. 4). The subject was "My heart" and the salutation was, "To you I share my heart." It contained pleas for her forgiveness, e.g.

> *With many tears I have written this to you.… When will you forgive me, my love? …What must I do to win back your love? What Must I do for you to take me back as your husband?....God hates divorce, and, though you feel you have that right, I beg for your mercy…*

(RR5: State's Ex. 4, second page).

When asked during her testimony about these invocations of the Lord and scripture, whether it was "part of your life," "business as usual," Mrs. Wagner testified that such characterizations were a "fair description" (RR3: 92). When asked if she objected to the invocation of God and the Bible and God's will, she said, "No." (RR3: 93). She acknowledged that she herself had texted Appellant about Christianity and the church (RR3: 89).

*State's Exhibit 5, the Email to Church Members*

The fifth and last state's exhibit at trial was a single email on a single page (RR5: State's Ex. 5). It was a letter from Appellant to members of the Mountain

Creek Community Church but not addressed to or sent to the complainant (RR5: State's Ex. 5). From Appellant, it was addressed to "my friends, mentors and leaders…" He exhorted them to contact complainant in the name of "the body of Christ" to ask her to forgive him. He said, "Laura seems to be getting counsel from unbelievers and they are putting fear in her heart." (RR5: State's Ex. 5). "I beg of you to help me." He said that the email was "a call to action":

> *"Please, if you still count me as your brother, I ask you to help me beyond prayer. Contact Laura and urge her to wait and be patient, allow me time to prove myself."*

(RR5: States Exhibit 5).[4]

Appellant made no request that the letter be sent to Mrs. Wagner.

Mrs. Wagner did receive the letter, however, not from Appellant but from a church member. The email showed on its face that it was a "Forwarded Message." The person sent it to her because he "thought [she] should read it because it had to do with [her]…" (RR3: 77-78).

Asked whether she believed this email to their fellow church members was harassing, Mrs. Wagner testified she believed it was harassment, because it was "slanderous, diminished my ability to make my own decisions" (RR3: 98). Asked if

---

[4] At trial and on direct appeal, defense counsel objected to admission of this particular email, because it was not a communication from him *directly* to her, He asserted that this made it not relevant and contrary to Tex.Evid. Rule 404(b) and harmful to the defendant under Rule 403.

she believed it was in violation of the protective order, Ms. Wagner responded, "I would say so" (RR3: 99).

<em>Telephone and Voicemails</em>

Mrs. Wagner testified there were also "two or three" voicemails left on her cell phone. He called her "several" times (RR3: 38-39). These were during the same time period as the emails and text messages. She testified the telephone voicemails were of the same nature as the text messages and the emails (RR3: 106), except for one, especially, on December 5 and another on December 7 when she testified "he had been served with the Petition for Divorce (RR3: 41) and he was expressing to me in the voicemail that he did not want a divorce. He was "very upset and crying and begged me not to divorce him and not to do this to our family." (RR3: 41).

<em>Mrs. Wagner's Testimony About "Harassing" Communications</em>

Beside her testimony about *Exhibit Five*, the email to church members, (RR3: 99), Mrs. Wagner testified to a variety of her feelings about communications from Appellant. Prosecution counsel read many of the text messages and emails in their entirety and elicited opinions from her. Her answers were that she was "concerned for safety" (RR3: 38); "I felt guilty for initiating a hearing for the protective order" (RR3: 29); "The calls "made me feel uneasy." (RR3: 42); and, "I felt annoyed he wasn't listening" (RR3: 52). He made her feel he "wanted sympathy" and "he wanted her to "console him" (RR3: 56). Concerning Exhibit 4, the long, five-page

9

poetic email, she felt "weirded out." It "wasn't something appropriate." (RR3: 62). "I felt like he was trying to prove to me that he was, you know, living a better life and living in God's will and that he had been redeemed and, you know, he was changed. He was trying to prove to me that he had changed and trying to win me back." (RR3: 66).

Prompted on direct examination, she said he had expressed a desire to reunite the relationship "more than 10 times." (RR3: 34). She was asked did she "consider his contact and his request to reunite the relationship to be harassment?" She said, "Yes." (RR3: 35).

"He [Appellant] never "showed up to [her] house." (RR3:31). She was never threatened whatsoever, even when asked, "[d]id he ever say 'if we're not back together,' something bad is going to happen to you?" (RR3: 35, 100).

On December 10, 2011, Mrs. Wagner complained to the Cedar Hill Police Department about his communications with her (RR3: 34). Asked "Why?" she said, "I went to report Paul for contacting me." (RR3: 34). She felt his conduct was harassment (RR3: 34). Counsel for the prosecution asked her, "[D]id you talk to the officer about the ways in which you believe the defendant was violating the protective order?"… "What did you tell him?" (RR3: State's Ex. 36). "I told him he had called me several times and left me voicemails and sent out an email, several emails to me." (RR5: State's Ex. 33). She complained of the volume and frequency

10

and length of the emails, the language he used, the love poems, which "made me feel like I was being coerced or twisting my arm or didn't make me feel comfortable at all." (RR3: 36).[5]

The last exhibit was offered by the defense (RR5: Defendant's Ex. 1). It was sent from Mrs. Wagner to Appellant on January 16, 2012, and in it, she suggested that he and she file a joint tax return for 2011 and that they, without intermediaries, negotiate its contents by direct communication with one another (RR3: Defendant's Ex. 1). She said nothing to indicate any distress or apprehension about communicating with him, although she acknowledged that in light of events, *he* [Appellant] might feel that way. In that case, she suggested he might prefer intermediaries:

> *"I would have sent this through our lawyers, but the amount of money it will cost us both to do that would be pointless. You can communicate through [mutual church friends] if you do not want to email me directly, I understand. But know we are still legally married so we are allowed to talk about this stuff the detective told me so."*

 (RR5: Defendant's Ex. 1).

## SUMMARY OF ARGUMENT

---

[5] The Court of Appeals, in its "The background" summary of the facts (Mem. Op. pp.1-5), lists the communications, of all types, chronologically. Beginning the day after the protective order, November 17, until the day Mrs. Wagner complained to the police, December 10 (a total of 22 days) there were nine days without any communication between them.

The statute in question, *Texas Penal Code* §25.07(a)(2)(A), is unconstitutionally vague and overbroad as applied to this defendant. The statute, the Protective Order, and the information allowed Appellant's prosecution and conviction for communications about his honest and earnest hope that they might be reconciled; and that his relentless pursuit of that goal represented the will of God. The same are unconstitutional as facially vague.

The U.S. Constitution's requirements of Free Speech and Due Process mandate that a penal statute give fair notice to an actor about what constitutes a crime. A statute may be unconstitutional also under the First and Fourteenth Amendments if its language is vague and overbroad, criminalizing conduct which ought not to be made criminal. Where freedom of speech is involved, a vague statute gets a higher level of scrutiny than otherwise.

There is no offense here without Appellant's attempts to dissuade his wife from initiating divorce proceedings -- whether the words he spoke or wrote to her during those 22 days were harassment. Except for fervent attempts to persuade her at least for a pause before initiating divorce proceedings, the communications were about ordinary family matters. Far from antisocial, reconciliation is a venerable goal-- to slow down dissolution of a family. Appellant's goal was consistent with universally applauded public policy. That he failed to win her over does not diminish

the legitimate purpose of his conduct. The Court must decide whether the content of those entreaties constituted "communicating… in a… harassing manner."

The Court of Appeals used the incorrect standard of review to decide whether the statute is constitutional. The communication involved here was "content based" and not "content neutral." The correct standard of review, "strict scrutiny," places the burden on the state to show that appellant's communications were not protected as free speech.

There would have never been a prosecution in this case but for the content of appellant's speech. The Information contains the words "communicating… in… a harassing manner." It may be that the offense is based on repetition of the communications as well as the content of the communications, but it cannot be said of that content was immaterial. Accordingly, the proper standard of review was strict scrutiny as enunciated in the case of *Ex Parte Lo* and additionally such standard of review cannot be waived.

## ARGUMENT AND AUTHORITIES

*First Question Presented for Review (Restated)*

**WHAT IS THE CORRECT DEFINITION OF THE PHRASE "COMMUNICATING ... IN A ... HARASSING MANNER" AS USED IN THE STATUTE FOR PROTECTIVE ORDERS IN FAMILY VIOLENCE CASES, AND, AS APPLIED IN THIS CASE, DID IT PENALIZE PROTECTED SPEECH IN VIOLATION OF PETITIONER'S FIRST AMENDMENT RIGHTS? [TEX.PEN. CODE §25.07(A)(1)(A)].**

## *Argument*

Appellant first argues the language of Texas Penal Code §25.07(a)(2)(A), *"...communicate ...In a ... harassing manner,"* is too vague and overbroad as applied to Appellant, rendering the Statute, the Protective Order, and the Information all in violation of U.S. Constitutional guarantees of Freedom Of Speech. Secondly, Appellant argues the language of *Texas Penal Code* §25.07(a)(2)(A), *"...communicate ...In a ... harassing manner,"* is too vague on its face, rendering the Statute, the Protective Order, and the Information all in violation of U.S. Constitutional Guarantees of Freedom of Speech.

The proper standard for this case is one of "strict scrutiny" of the free speech issues as enunciated in case of *Ex Parte Lo,* 424 S.W. 3d 10 (Tex. Crim. App. 2013), because the communications in this case were "content-based." In the alternative, the standard of review should be with the burden on appellant to show his communications were not harassing, the standard as stated in the case of *Ely v. State, 582 S. W. 2d 416* (Tex. Crim. App. 1979). The Supreme Court has held a government regulation of expressive activity is content neutral as long it is justified without reference to the content of the regulated speech. *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989).

The statute under which appellant was convicted, *Texas Penal Code* §25.07 ("§25.07"), punishes violations of Protective Orders and conditions of bail in family violence cases. Violation is a Class "A" misdemeanor. TEX.PEN.CODE §25.07(g) (West 2010). To be guilty under §25.07, a defendant must be shown to have known that he was subject to a protective order. *Harvey v. State*, 78 S.W.3d 368 (Tex. Crim. App. 2002).

The statutory language pertinent to this case is as follows:

*A person (subject to a protective order) commits an offense if ... the person knowingly or intentionally:*
*(2) communicates:*
*(A) <u>directly</u> with a protected individual or a member of the family or household in a threatening or <u>harassing manner</u> (emphasis added).*

TEX.PEN. CODE §25.07 (a)(2)(A) (West 2010).

The <u>information</u> in this case (CR: 11), as amended (CR: 26), charges appellant, in pertinent part, as follows:

*...defendant did intentionally and knowingly... <u>communicate</u> directly with Laura Wagner, a protected individual... <u>in a</u> threatening and <u>harassing manner</u> in that Defendant did make repeated telephone calls to complainant and defendant did send repeated text messages and emails to complainant... in violation of a [Protective Order] signed November 16, 2011... (emphasis added) (CR: 11, 26).*

The emphasized language in the statute and information are vague and overbroad in violation of the First Amendment to the U.S. Constitution guaranteeing Freedom of Speech and applicable through the Due Process of Law guarantee of the 14th Amendment to the U.S. Constitution. U.S. CONST., AMEND. I, AMEND XIV.

15

In *May v. State*, 765 S.W.2d 438 (Tex. Crim. App.1989) (*en banc*), the Court of Criminal Appeals held the Texas Harassment statute unconstitutional for infirmities similar to those in this case. The court said, "[i]t is axiomatic that vague laws offend the federal Constitution by allowing arbitrary and discriminatory enforcement, by failing to provide fair warning, and by inhibiting the exercise of First Amendment freedoms." *May* at 439. "By failing to provide reasonably clear guidelines, *Texas Penal Code* §42.07 (Harassment) gives officials unbounded discretion to apply the laws selectively and subjects the exercise of the right of to free speech to an un-ascertainable standard. Accordingly, we hold that the Texas Harassment Statute is unconstitutional on its face for vagueness." *Id*. at 440.

Use of the word "harassing" in this statute is an invitation to misunderstanding – whether by a person subject to a protective order who believes he is lawfully exercising his right, whether by a "protected individual," or whether by a police officer affecting an arrest. It is so vague that "harassing manner" is in the eyes of the beholder (e.g. Mrs. Wagner in this case, as demonstrated by her trial testimony).

In analyzing a facial challenge and overbreadth and vagueness of the law, the U. S. Supreme Court in *Village of Hoffman Estates v. Flipside, Hoffman Estates, 455 U.S. 489 (1981)*, stated that:

> "A court's first task is to determine whether the enactment reaches a
> substantial amount of constitutionally protected conduct. If it does not, then
> the overbreadth challenge must fail. The court should then examine the facial

vagueness challenge and, assuming the enactment implicates no constitutionally protected conduct, should uphold the challenge only if the enactment is impermissibly vague in and all of its applications. A plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others. A court should therefore examine the complainant's conduct before analyzing other hypothetical applications of the law."

"A statute is considered impermissibly overbroad if, in addition to proscribing activities which may constitutionally be forbidden, it sweeps within its coverage speech or conduct which is protected by the First Amendment." *Clark v. State*, 665 S.W.2d 476, (Tex. Crim. App. 1984); *Long v. State*, 931 S.W. 2d 285 (Tex. Crim. App. 1996); *Kramer v. Price*, 712 F. 2d 174 (5th Cir. 1983), affirmed *en banc,* 723 F. 2d 1164 (5th Cir. 1984); *Bynum v. State*, 767 S.W.2d 769 (Tex. Crim. App. 1989).

Appellant testified at the motion for New Trial/Arrest of Judgment hearing August 29, 2013. (RR4: 48-24) He vouched for the accuracy of his affidavit and said he had made changes in an early draft and the four-page affidavit in support of the motion was admitted in evidence, as well as the combined motion itself, without objection (RR4: 7).

He testified he did not know his communications with his wife would be deemed "in a… harassing manner" (RR for: 14). He had no intention to harass Mrs. Wagner (RR4: 15). He did not know a definition of "harassing manner." (RR4: 24). On cross-examination he answered the prosecutor's question "did she seem to encourage you to communicate …, to email or text, to continue to have contact with

her?" He answered; "Yes. By responding to my emails and initiating contact on her own." (RR4: 24)

Mrs. Wagner asked Appellant to stop texting on November 28, and he stopped (RR4: 18). He said she never asked him not to send emails, and she sent emails to him (RR4: 19). After he left her a voicemail after being served with the divorce petition, he received a call from his lawyer to cease all communications with her because she had called the lawyer's home to complain. Appellant said he did as he was instructed and stopped communicating with her. (RR4: 12)

He corroborated Ms. Wagner's testimony about their church and the place of God and religion in their lives (RR4: 10). Concerning the email which he sent to members of the church imploring them to contact her to dissuade her from divorcing him (RR5: State's Exhibit 5), their failure to respond to his "call to arms" "left me in turmoil with my own… Faith... [I]t felt like a betrayal… They're there for me in good times, and not there for me in bad times, and not even …offering any kind of support" (RR4: 17).

*Patton v. State*

In the instant case the Fifth Court of Appeals held that "*[A] person harasses another when he persistently disturbs, bothers continually, or pesters that person.*" *Wagner v. State*, No. 05-13-01329-CR, (Tex. App.-Dallas, delivered May 5, 2015) (Mem. Op.) (Not Designated for Publication) following an earlier Fifth District

18

Court of Appeals case, *Patton v. State*, 835 S.W.2d 684 (Tex. App-Dallas, 1992, no pet.).

Patton was an appeal of a conviction for violating a protective order, based on the same statute as in the case at bar. The opinion discusses three separate misdemeanor cases, each for violation of a protective order. There is no constitutional challenge. There is no challenge to the definition of harassment. Instead, the defendant challenged the sufficiency of evidence in two of the three cases and whether there was a fatal variance between allegation and proof in the third. The Fifth Court of Appeals affirmed all three convictions. Where sufficiency of evidence was challenged, the evidence showed threats and behavior which would be judged harassment by any definition where the defendant called his wife at work numerous times and told her that he was going to follow her home and run her car off the road; and, defendant called at 4:00 AM, then continuously while she was at work saying that she should "watch [her] car." *See, Patton*, 835 S.W.2d at 686 – 87).

This Court has said about statutory ambiguity: "A statute is ambiguous when the language it employs is reasonably susceptible to more than one understanding." *Baird v. State*, 398 S.W. 3d 220 (Tex. Crim. App. 2013) (citing *Mahaffey v. State*, 364 S.W.3d 908 (Tex. Crim. App. 2012)("where application of a statute's plain language… is not plain but rather ambiguous, a court may consider extratextual factors…"). In *Patton,* its facts rendered consulting "extratextual" assistance

unnecessary. Nevertheless, in determining sufficiency, the Dallas Court of Appeals turned to *Webster's Encyclopedic Unabridged Dictionary* (1989) for definitions of "threatening" and "harassing." The court's decision needed no dictionary help. Consulting *Webster's* was superfluous and, therefore, arguably, dicta. Nonetheless, the *Webster's* dictionary definition of "harassing" ("A person harasses another when he persistently disturbs, bothers continually, or pesters that person.") is the definition the Dallas Court of Appeals applied in this case citing *Patton*. *See*, Mem. op. at 7.

If this is, indeed, the Fifth District definition, it sets the bar for arrest, prosecution, and conviction very low. The *Webster* definition almost makes violations of Section 25.07(a)(2)(A) preordained. The background circumstances of a §25.07(a)(2)(A) case necessarily involve two persons seriously at odds with one another, usually estranged husbands and wives. That there had been family violence is a prerequisite to obtaining a Protective Order. Moreover, one of those persons, usually the wife, makes a choice to seek a Protective Order. That entails interviews and affidavits in preparation. Finally that person must participate in a hearing at a courthouse before a judge. A Protective Order cannot be issued secretly. To be effective, it must be served on the respondent, not something likely to endear him or her to the person who obtained it. Finally, a Protective Order significantly restrains its subject from conducting his customary activities involving his home and family.

Almost by definition, persons arrested and jailed for family violence, bad enough, now suffer the ignominy of a protective order. The issuing court can choose to what degree the respondent is limited in his activities. He can forbid direct contact or, as in this case, allow direct communication so long that it is neither "threatening" nor "harassing."

It is within such a tense environment than a violation occurs. The respondent is probably angry. The protected party may be smug, very frightened, seductive, or hysterical. Communication usually means by telephone, or in these modern times, email and text messages. Is it not predictable that a protected party would be on tender hooks? Almost any communication from the respondent would be bothersome, disturbing, or pestering. The dictionary definition relied upon in *Patton* says the disturbing should be "persistent" and the bothering should be "continually." There is no modification of "pestering." "Persistently disturbs" could constitute almost any communication repeated several times, whether or not it was justified. For example, what if the respondent needs items from the house and the protected party fails to comply? There is very little difference between "persistently disturbs" and "bothers continually." "Pesters" without qualification or definition could be any communication whatsoever in the mind of the protected party (e.g. hypothetically "… he keeps pestering me about the car;" or "about the dog;" or "about needing items of clothing").

In such a volatile environment, it is easy to imagine that a protected party would consider themselves as the victim of communications in a harassing manner. And applying the *Patton* definition, how likely is it that the police officer or even a magistrate would pause before initiating action – usually arrest and incarceration.

*Garcia v. State*

In 2006, the Third District Court of Appeals considered a constitutional challenge to the same statutory provision as in this case and for the same reasons. The issue was whether the same language in Penal Code §25.07(a)(2)(A) – "communicating…in a…harassing manner"-- was unconstitutional for its vagueness. *See*, *Garcia v. State*, 212 S.W.3d 877 (Tex. App. – Austin 2006). In that case, Garcia asserted that the statute failed to define what kind of communication is "harassing." *Id*. at 887. In obedience to its obligation to construe the word "harass" to avoid constitutional infirmity, if possible, the Court of Appeals construed "harass" as did the Texas Supreme Court in a lawyer disciplinary matter, *Commission for Lawyer Discipline v. Benton*, 980 S.W. 2d 425 (Tex. 1998). The Texas Supreme Court was confronted with a similar problem in the application of a provision of the Texas Disciplinary Rules of Professional Conduct, Section 3.06 [d], which included the word "harass." In doing so, the Texas Supreme Court fashioned its own definition of "harass," which included four elements:

*1. A course of conduct,*
*2. Directed at a specific person,*
*3. Causing or tending to cause substantial distress, and*
*4. Having no legitimate purpose.*

*Benton*, 980 S.W. 2d at 439.

The Third Court of Appeals added a "*reasonable person*" standard to the Texas Supreme Court's definition to further avoid vagueness, as follows: "the course of conduct must be such as would cause a reasonable person to suffer substantial emotional distress and must actually cause substantial emotional distress to the person." *Garcia*, 212 S.W.3d at 891, FN 9. This is in harmony with some of the cases cited by the Supreme Court. *See, e.g.*, *Snowden v. State*, 677 A.2d 33, 36 n. 1 (Delaware 1996) (as cited in *Benton* at 439).

Appellant herein would be exonerated if such a definition were applied to his communications in this case. Although his was a "course of conduct" directed at a specific person, his disaffected wife, a fair application of the third criterion, "causing or tending to cause substantial distress," requires parsing of the evidence. *See*, *Benton*, 980 S.W. 2d at 439. While Mrs. Wagner most certainly experienced displeasure, discomfort, and stress, it did not reach the level of "a substantial distress." *Id*. It can be said that at least part of her distress was not "caused" by communications from Appellant but, instead, attributable to the facts and circumstances of her overall situation. Suddenly, she had become a young mother with a very young child but without a job or a husband. This abrupt change in her

circumstances was quite sufficient to "cause or [tend] to cause" complainant's distress. She had taken the child to Mexico and now the little girl was sick and needed medicine at a time when the family's health insurance was in jeopardy (RR5: State's Ex. 2, first page, the initial test messages).

### "*No" Legitimate Purpose*

Regardless of the first three criteria established by the Texas Supreme Court in *Benton*, the evidence in this case does not rise to the level of the fourth and last criteria, that his communications had "no legitimate purpose". *Benton's* fourth criterion is absolute, without qualification, because it says none, not any legitimate purpose. *Benton*, 980 S.W. 2d at 439. Much of Appellant's communications were about mundane family matters, often in response to Mrs. Wagner's communications. It cannot be said that those communications were without any legitimate purpose.

The other kind of communication, were his fervent, sincere pleas to her to reconsider initiating divorce proceedings, if only for a little while. These communications were never abusive. There is nothing in the evidence to suggest they were not genuine. In urging caution and pleading for respite, Appellant was on the side of mainstream professional thinking and public policy here and throughout the Western world. The Texas Family Code is an example. It requires a 60 day waiting period before married couples can be divorced. The rationale for this delay is that people should not rush into divorce. *See*, TEX.FAM. CODE §6.702. Those

provisions of the family code concerning "Dissolution of Marriage," while laying down a road map ending in divorce, also contain provisions such as §6.505 (b), which gives the District Court power to order the parties into counselling if there is any reasonable expectation of reconciliation. TEX.FAM. CODE §6.505(b). Of course husbands and wives get divorced anyway, but nobody can say such cautionary measures have "no legitimate purpose."

Another form of communication from appellant to complainant, are those where he invokes God and the Bible in his arguments to slow down the divorce process. As Mrs. Wagner testified herself, it was nothing remarkable in their daily lives for her and Appellant to speak in the manner shown by his religious communications to her (RR3: 93). She never suggested that Appellant's religious practices and his religious communications to her were not genuine.

Observers unaccustomed to such hyper religiosity among Christians may judge them unfairly. They have a right to their beliefs and his speech which trumpets those beliefs. Who can fairly assert that such communications have no legitimate purpose?

Besides ordinary discussions about money, bills, and the baby, the communications were attempts by the crestfallen husband to dissuade his wife from initiating divorce proceedings. This was protected free speech. Its purpose was not harassment but intended to influence his wife to preserve the marriage. In his

25

communications, Appellant invoked secular reasons (e.g. that their child not grow up in a broken home), and he embellished his communications to her with Christian/biblical doctrinal quotations and allusions. Ironically, the manner of his invocation of "full gospel" Christianity in his cause may well offend outsiders at first – including Christians – unaccustomed to the argot of Pentecostal worship and belief. In truth, his unabashed invocation of religion was quintessential First Amendment free speech -- augmented by religious expression.

Mrs. Wagner described how Appellant's speech made her feel:

"like he was trying to prove to me that he was, you know, living a better life and living in God's will and that he had been redeemed and, you know, he was changed. He was trying to prove to me that he had changed and trying to win me back."

(RR3: 66).

It is clear Mrs. Wagner believed these communications were unlawful, but what she characterized in her testimony as unlawful harassment can be seen just as well as an exemplar of what the First Amendment was made to accomplish. As she described her own feelings about it, she made the single best example in the case for finding it "protected speech."

Ultimately, if Texas' "harassment" jurisprudence follows the Supreme Court's *Benton* definition, then Paul Wagner's communications to his wife during the three weeks following the protective order were not "in a harassing manner." On other hand, if this case proceeds without an acceptable definition of "harassing

manner," then the statute is unconstitutional as facially vague and too vague and overbroad.

*Second Question for Review (Restated)*

**WHETHER THIS IS A "CONTENT-BASED" FIRST AMENDMENT CASE AND OUGHT TO HAVE BEEN DECIDED BY A DIFFERENT STANDARD OF REVIEW, "STRICT SCRUTINY" AS ENUNCIATED IN THE CASE OF *EX PARTE LO*.**

*Third Question for Review (Restated)*

**IF STRICT SCRUTINY IS THE PROPER STANDARD OF REVIEW, WHETHER THE CORRECT STANDARD OF REVIEW CAN BE WAIVED.**

Appellant's Brief and the State's Brief were filed in the spring of 2014. Neither brief cited *Ex Parte Lo*, 424 S.W. 3d 10 (Tex. Crim. App. 2013). Appellant did so for the first time in his Reply Brief, asserting that it controlled in this case and its "strict scrutiny" standard should be the standard of review as opposed to the standard enunciated in *Ely v. State*, 582 S.W.2d 416 (Tex. Crim. App. 1979). Appellant's Reply Brief at 1 – 2.

In a Supplemental Brief allowed by the court, the State took issue. The State argued this case was a "content-neutral" rather than "content-based" statute, and strict scrutiny was inapplicable. The State said Penal Code § 25.07(a)(1)(A) confers benefits or imposes burdens on speech without reference to the ideas or views expressed. State's Supp. Brief at 2-3. The State insisted that that "harassing" communications in the Protective Order statute "depended upon the frequency and

effect of the communication, not their content." State's Supp. Brief, p. 5. In a footnote the State notes that the "manner and means" in the information speaks only of the frequency of the communications, not the content. State's Supp. Brief, p. 5, Fn. 3. This overlooks the Information's language which accuses the defendant of communicating "in a threatening and harassing manner…" And other language in the charging document that his actions were "in violation of an order issued by the 292nd Court in Dallas County," i.e. The Protective Order (CR: 11), which charged Petitioner with "communicating… in a… *harassing* manner." The word "harassing" modifies the manner of communications, so it describes content as well as frequency.

As if to illustrate this ambiguity, the Dallas Court of Appeals, while arguing in agreement with the State that the content of Petitioner's communications were irrelevant, nevertheless wrote "[T]he statute clearly protects Laura [Wagner] from appellant's repeated, unsolicited, and unwelcome communications *in which he professes his love and begged her not to divorce him*" (Emphasis added). Mem. Op. at 9. It should be clear, despite arguments to the contrary, content mattered to the Court of Appeals.

Since the Court of Appeals memorandum opinion in this case, this Court has further elucidated and enlarged the reach of the First Amendment and "Strict Scrutiny" in Texas criminal litigation by its ruling in *Thompson v. State*, No. PD-

1371-13(Tex. Crim. App. 2014). That opinion held unconstitutional on its face Tex. Pen. Code §21.15 (b)(1), the "improper photography or visual recording statute."

In a footnote to its opinion, the court below chose to apply the customary standard of review with the burden on the defendant to establish unconstitutionality. Mem. op. at p. 6, FN 4. In explanation, the footnote explained that appellant had first raised the argument about *Ex parte Lo* and "strict scrutiny" in his Reply Brief. It rejected the content-based strict scrutiny standard on the grounds, in effect, that the standard had been waived by the appellant. This was error. *See, e.g., Marin v. State*, 851 S.W.2d 275, 279-80 (Tex. Crim. App. 1993) (overruled on other grounds by *Cain v. State*, 947 S.W.2d 262, 264 (Tex. Crim. App. 1997)). A correct standard of review cannot be waived.

The Court of Appeals also said there had been no discussion by Appellant or authority to establish that this case was "content-based." On the contrary, Appellant had cited and examined the language in *Ex Parte Lo* that "when the government seeks to restrict and punish speech based on its content, the usual presumption of constitutionality is reversed." Further, petitioner argued in his Reply Brief that in "this case the prosecution seeks to punish speech it "disfavored" based on the ideas expressed. Appellant's Reply Brief at 7.

Finally in the opinion footnote, the Court of Appeals said it was rejecting the *Lo* strict scrutiny standard because "the statute itself does not address the content of

communications.…" Mem. op. at 6, FN 4. This is a mistake. It ignores or overlooks the statutory language which prohibits communication in a "harassing manner." Both the state and the Court of Appeals arbitrarily insist that this statutory phrase refers only to the frequency of communication and not it's content. Yet there is no statutory explanation of what "harassing manner" means. That is the problem. It is the central issue in this appeal. The assertions of the state and the court are belied by their own arguments which invariably discuss content, e.g. appellant's begging his wife to postpone divorce and give him a chance to prove that he had changed. The opinion is replete with descriptions of the content of appellant's communications to his disaffected wife. Even the dictionary definition embraced by the Fifth District court bespeaks content. Mem. op. at 7, FN 5. For example, the words "disturbs" and "bothers" can as easily refer to the content of frequent messages as to frequency alone.

The only substantive explanation given by the court for rejecting the strict scrutiny standard is that the statute itself does not show it is "content-based." As shown in the foregoing paragraphs, Appellant disputes that argument. However, even if the statutory language by its terms does not show it is "content based," *Ex Parte Lo* demands more than reading the statute to determine whether is the "strict scrutiny" standard should apply. It says the First Amendment requires examining the content of the speech in question.

*"If it is necessary to look at the content of the speech in question to decide if the speaker violated the law, then the regulation is content-based…[F]or example, if the statute makes it a crime for an adult to communicate with a minor via the Internet, that is a content-neutral law. But if the statute prohibits an adult from communicating with a minor in a sexually explicit manner, that is a content-based law because one has to look to the content of the communication to decide whether the person violated the law."*

*Ex Parte Lo, p. 7. Fn.12.*

That statement could be applicable as well to the case at bar, because, as shown again and again in the Court of Appeals opinion, "it is necessary to look at the content of the communications to determine if the statute is violated. The 12th footnote to the *Ex Parte Lo* opinion repeats the admonition: "[I]f it is necessary to look at the content of the speech in question to decide if the speaker violated the law, then the regulation is content-based." *Ex Parte Lo*, 424 S.W. 3d at 10, FN 12.

 (citing <u>*Gresham v. Peterson*</u>, 225 F.3d 899 (7th Circuit 2000)).

Whether *Penal Code* Sec. 25.07(a)(2)(A) is constitutionally infirm should have been determined by the strict-scrutiny standard.

31

## PRAYER

Appellant prays this Court reverse the conviction and enter an acquittal, or in the alternative, reverse the conviction and remand this case to the Court of Appeals for further proceedings or remand this case to the trial court for a new trial.

Respectfully submitted,

DAN WOOD, JR.
ATTORNEY AT LAW
4303 N. Central Expressway
Dallas, Texas  75205
Tel: (214) 559-8815
Fax: (214) 696-0867
Email: danwoodjr@sbcglobal.net


VINCENT W. PERINI
 ATTORNEY AT LAW
2501 Oak Lawn Ave., Suite 560
Dallas, Texas  75219-4082
Tel. (214) 750-7477
Fax (214) 521-5690
Email: vperini@airmail.net


By:   /Vincent W. Perini/
Vincent W. Perini
State Bar No. 15782000

**ATTORNEYS FOR APPELLANT**

## CERTIFICATE OF SERVICE

I certify the foregoing Appellant's Brief on the Merits was served upon the State of Texas by sending a true and correct copy to the Criminal District Attorney of Dallas County via mail to: Hon. Susan Hawk, Criminal District Attorney, Attn: Appellate Section, Frank Crowley Court Bldg., 133 N. Riverfront, LB 19, Dallas, TX 75207, and to the State Prosecuting Attorney, via mail to: P.O. Box 13046, Austin, TX 78711-3046, on December 28, 2015.

/Vincent W. Perini/
_____
Vincent W. Perini
Attorney for Appellant

## CERTIFICATE OF COMPLIANCE

In accordance with Rule 9.4(i) of the Texas Rules of Appellate Procedure, I certify that the total word count for the foregoing Petition for Discretionary Review is 7,389 words as shown by the word count function of the computer program, MS Word 2007, used to generate the document.

/Vincent W. Perini/
_____
Vincent W. Perini
Attorney for Appellant